## UNITED FIDELITY LIFE INS. CO. v. ROACH et al.
### No. 4058.

Court of Civil Appeals of Texas. Amarillo.
Sept. 27, 1933.

Rehearing Denied Oct. 11, 1933.

Earl Wyatt, of Amarillo, for appellant.
Wm. F. Nix, of Amarillo, for appellees.

MARTIN, Justice.

Appellees instituted suit against appellant as beneficiaries under a life insurance policy in the sum of $2,500 and containing a double indemnity benefit clause for an additional sum of $2,500 on the life of the insured if death resulted from accident as therein defined.

The appellant filed answer, admitting liability in the sum of $2,500 and tendering into court the last-mentioned sum in full settlement of its liability, and pleaded the exception in the policy hereinafter set forth as a defense to that part of the cause of action, under the double indemnity benefit clause of said policy.

The trial was before the court, who rendered judgment for appellees as prayed for.

The original policy was issued by the National Security Life Insurance Company, whose liabilities were thereafter assumed by appellant.

Clauses of the policy affecting the law question decided are as follows:

"The National Security Life Insurance Company agrees that should the death * * * be caused by accident, as herein defined, to pay the Insured named in said policy the sum of $2,500.00 * * *

"This sum shall be paid only if the Company shall receive due proofs:

"(2) That the death of the beneficiary did not result directly or indirectly, wholly or partly from suicide whether sane or insane, from murder, poisoning, bacterial infection, illness or disease of any kind."

The case was tried upon an agreed statement of facts. We quote from this such of the agreed statement as illustrates the law point decided herein:

"That the death of the said Lunnie Boney occurred in substantially the following manner, to-wit: Lunnie Boney lived in a house, the bath room of which was equipped with an automatic hot water heater; the fuel being natural gas and located in said bath room was also a small gas heater also using natural gas. That the automatic heater was vented with three-inch pipes which came through the wall of the house on to the back porch. The open heater was not vented at all. The vents from the hot water heater contained nests that had been built therein by birds which obstructed or partially obstructed the venting system of said hot water heater. On the morning of April 5th the automatic heater had been burning about two hours. The open heater in the bath room was not burning. Lunnie Boney went into the bath room on the 5th day of April, 1932, and remained therein between fifteen minutes and a half hour, and upon emerging therefrom she went immediately to a bed room in the building and complained of being sick, stating that she believed the gas had made her sick. She breathed hard once in a while but she did not have any convulsions. A doctor was called and gave her medical attention, giving her a heart stimulant and strong coffee and she died within about an hour after she came out of the bath room. * * *

"It is further agreed that carbon monoxide fumes are produced from the burning of natural gas under certain conditions and that carbon monoxide gas was produced by the burning of natural gas in the bath room where Lunnie Boney became ill on the day in question and that the inhalation of such fumes resulted in asphyxia, which caused her death. * * *

"That carbon monoxide is an insidious, subtle and deadly poison and is such a substance that when introduced into the human body or absorbed into the blood and acting chemically, is capable of seriously affecting health or destroying life and this is its usual effect upon the healthy body, when inhaled, as Lunnie Boney did inhale it on the day in question, and that the inhalation of such carbon monoxide resulted in her death.

"It is further agreed that at the time Lunnie Boney breathed the carbon monoxide gas that the act was upon her part an unconscious act and that she did not know the room contained said gas nor that she was inhaling any poisonous substance nor any injurious gases."

The entire legal controversy here revolves around the construction to be given the last clause of the policy above quoted exempting the insurance company from liability unless the proof of death showed "that the death of the insured did not result directly or indirectly, wholly or partly * * * from poisoning."

It is the claim of appellant that death resulting from inhaling carbon monoxide gas is a death from poisoning and is within the exception exempting the insurance company from liability. It is the contention of the appellees, in substance, that the accidental inhalation of gas which results in death by asphyxiation is not a death from poisoning, and further that the meaning of the word "poisoning" in common use does not include asphyxiation by the involuntary, accidental, and unconscious inhalation of poisonous gases or fumes, and that the use of the word "poisoning" in the exception aforesaid rendered the entire clause ambiguous and subject to two or more constructions which renders it mandatory upon the courts to give it the construction most favorable to the insured.

We have had trouble in solving this question, which an investigation discloses has been the subject of much judicial discussion. Finespun logic, hazy distinctions, and a general contrariety of opinion faces the investigator searching the authorities for a correct solution. It would, we think, be a profitless, as well as an impossible, task to attempt here to harmonize all judicial expressions and conclusions on this subject. Many of the decisions are listed in the notes to the following cases: Jones v. Hawkeye Commercial Men's Association, et al., 11 A. L. R. 380; Riley v. Inter-State Business Men's Accident Association, 2 A. L. R. 57; Hawkeye Commercial

Men's Association v. Christy, 40 A. L. R. 46. See, also, 1 C. J. pp. 455, 456.

■ That the death of the insured in this case was an accidental one, and therefore within the general terms of the policy, is well settled and is not here disputed. The naked question presented is whether or not such a death is within the exception of the policy quoted above relieving the insurer from liability where the death of the insured results "from poisoning."

■ In modern times monoxide gas poisoning is rather frequent and its deadly character as a poison is, we think, well known. The early cases dealing with this subject were rendered at a time when such deaths were very rare. Gas poisoning took on a new meaning during the World War and the methods of modern civilization since that time have been prolific in producing such cases. At least one state in the Union uses gas poisoning as a means of ending the life of convicts receiving the death penalty. It can hardly be said, we think, as contended, that the use of the word "poisoning" in the policy here was not intended to include cases of poisoning by gas or that the meaning of such term is so doubtful as to give rise to the application of the well-known rule of strict construction in favor of the insured in case of a doubtful meaning of terms used in the policy. The courts have had frequent occasion to pass on policies containing an exception saving the insurance company from liability in case death was caused from "inhaling gas or taking poison." With practical unanimity the courts have held that the use of the words "inhale" or "take" import a voluntary or intentional act and excluded involuntary and unintentional ones.

About the first and leading case on that subject is that of Paul v. Travelers' Insurance Co., 112 N. Y. 472, 20 N. E. 347, 349, 3 L. R. A. 443, 8 Am. St. Rep. 758. In said case, after construing "inhale" as above indicated and holding the insurance company liable, the court proceeded to say: "If the policy had said that it was not to extend to any death caused wholly or in part by gas, it would have expressed precisely what the appellant [the insurer] now says is meant by the present phrase, and there could have been no room for doubt or mistake."

■ Here the exception is "from poisoning" not "taking or inhaling poison." Applying the converse of the very rules laid down by the cases relied on by appellees, the conclusion seems inescapable that the use alone of the word "poisoning" means, or was intended to mean and include, an involuntary taking or inhalation of poison and therefore relieves the insurance company from liability. This is plainly implied, if not directly held, by the case last cited and which has been many times followed by the courts of the United States. Such was the construction given this phrase in the very recent case of Urian v. Scranton Life Ins. Co., 310 Pa. 144, 165 A. 21, by the Supreme Court of Pennsylvania. This was a monoxide gas poisoning case. The clause of the policy construed was the same as the one under discussion. The opinion was rendered by a unanimous court January of this year. It is in point and well reasoned. We have found no case in or out of Texas whose facts parallel the instant one, except this one case. The Pennsylvania case establishes a precedent not necessarily binding on us, it is true, except as its logic may compel an acceptance of its conclusion; but we would fail, as we see it, in our duty if we further unsettled this perplexing question by announcing a contrary conclusion unless forced to do so by what seems to us to be compelling reasons. Such reasons do not now occur to us. There must be some element of certainty in the law. Otherwise human enterprise cannot proceed with any sense of security. The effect of the stipulation of the policy is to relieve the insurer from liability if death is caused from "poisoning." This term is used broadly without any qualification, and we cannot here exclude from its operation a death resulting from an unintentional act of the insured, without making, as we see it, a new contract for the parties. We are relieved of the necessity of attempting to demonstrate the cause of her death by the agreement quoted above. Under such, it is admitted her death was from monoxide gas poisoning, though the broader term "asphyxiation" would also correctly describe it. Asphyxiation may occur from a variety of causes, one of which is monoxide gas poisoning. We are not able to agree with the contention of appellees that death from asphyxiation is not within the exception of the policy where, as here, the asphyxiation resulted directly "from poisoning."

Only the double indemnity feature of the policy is before the court. The facts with reference to it being undisputed, it is ordered that the judgment of the trial court be reversed and here rendered for appellant.

### On Motion for Rehearing.

A plausible argument has been made on motion for rehearing to the effect that the broad interpretation we have given the word "poisoning" can be made the basis for a claim that death resulting from any poison comes within its terms. As an illustration: That a death from typhoid fever resulting from drinking water infected with typhoid germs would be a death from "poisoning," as also would a death from ordinary "blood poisoning." We restrict our holding to the particular facts of this case; that is, a case where a substance generally known as poison is introduced into the human body direct-

ly causing death without any intervening cause.

Motion overruled.