MARY CULLEN CLEAVER v. CENTRAL STATES LIFE INSURANCE COMPANY, a Corporation, Appellant.—142 S. W. (2d) 474.

Division One, July 9, 1940.

*Walter C. Goodson, Jones, Hocker, Gladney & Grand* and *James C. Jones, Jr.,* for appellant.

*Cullen, Storckman & Coil* and *Waldo Edwards* for respondent.

552

HYDE, C.—This is an action on an insurance policy for $10,000, with interest and damages for vexatious delay including attorney's fee. Plaintiff had verdict and judgment for the total amount of $11,500, and defendant has appealed.

By the policy, issued October 6, 1928, defendant agreed to pay to plaintiff as beneficiary "immediately upon receipt of due proof of death of Thomas E. Cleaver, the insured, the sum of Ten Thousand Dollars, which is the face amount hereof." The insured died on February 4, 1939, from "the result of the inhalation of carbon monoxide gas from the exhaust of his automobile while he was working thereon, and the inhalation of said gas was accidental and not intentional on the part of the insured." Defendant paid plaintiff this face amount of the policy (with deduction for indebtedness), prior to the filing of this suit, without prejudice to the further claims or defenses of either party. This suit was brought on the double indemnity agreement, stated to be "supplementary to and forming a part of" the policy, by which the company agreed to pay the addi-

tional amount sued for "in event of the accidental death of the insured as hereinafter defined." The policy then provided: "The additional sum payable in the event of the accidental death of the insured shall be due if the company receive due proof that such death occurred during the premium paying period, before default in the payment of any premium, before the allowance of any total and permanent disability benefits, and (stating other requirements not in controversy) . . .; provided that this double indemnity benefit *shall not be payable if the death of the insured shall result* directly or indirectly, wholly or partly, *from* physical or mental infirmities, *poison,* ptomaines, bacterial infections or from any disease, from suicide or any attempt thereat while sane or insane." (Our italics.)

Defendant contends that "death from carbon monoxide is a death from poison within the exception of the double indemnity benefit." Defendant says that "it is now a matter of common knowledge that carbon monoxide is a poison," and that it was, therefore, erroneous to submit any issue about it to the jury; but that its peremptory instruction should have been given. Plaintiff had expert medical testimony to show the nature of carbon monoxide gas and its effects. (The case was tried upon an agreed statement of facts except as to this matter.) As shown by this testimony carbon monoxide gas is a colorless, odorless combination of carbon and oxygen produced by incomplete combustion of gasoline in a motor.

Plaintiff's witness, Dr. Barnes, testified:

"Carbon monoxide acts when inhaled with breathing by combining with the hemoglobin in the blood and making it impossible for that same hemoglobin to combine with oxygen to carry oxygen throughout the body. It acts, in other words, by process of asphyxiation, produces the effect of suffocation. An individual cannot live without oxygen. The hemoglobin normally carries oxygen. . . . If a person drowns they are enveloped, so far as the breathing apparatus is concerned—the head—with water. The lungs are flooded; the oxygen does not get in in sufficient quantities. There is suffocation. And that, in general, acts in a like manner as carbon monoxide in suffocation. . . . Poisons are substances which, if taken into the body or injected into the body—somehow or other gotten into the body or structural cells of the body—destroy them in whole or in part and to a sufficient extent in some instances to cause death. The carbon monoxide is a gas which is inhaled and is not destructive to the tissues or the cells; is absorbed because of the chemical affinity with the hemoglobin in the blood, but not permanently so, and may be discharged from the hemoglobin, and may be taken in quantities ordinarily large enough to promote death, safely, under conditions where the atmospheric pressure is increased on the individual so that still there is sufficient oxygen in the blood, even though the carbon monoxide is present, without producing death. . . . Death resulting

from inhalation of carbon monoxide is due to asphyxia, anoxemia, lack of oxygen in the blood; not from its poisonous action. . . . It isn't a poison. It isn't a poisonous gas. It doesn't destroy tissue."

Other medical testimony was similar to this. Defendant offered no testimony but cites dictionaries, encyclopedias, and medical works referring to carbon monoxide as a poisonous gas, and to its effect as carbon monoxide poisoning. Defendant says this is a matter of such common knowledge that expert testimony was inadmissible; and that, as a matter of law, insured's death should be held death from poison. Defendant also relies upon Urian v. Scranton Life Ins. Co. (Pa.), 165 Atl. 21, and United Fidelity Life Ins. Co. v. Roach (Tex.), 63 S. W. (2d) 723. Plaintiff says that death from inhalation of carbon monoxide gas is death from asphyxiation and is not death from poison, citing 1 C. J., 455-456, secs. 133 and 136, and cases cited; Brock v. American Central Life Ins. Co. (Mo. App.), 44 S. W. (2d) 200; Kingsley v. American Central Life Ins. Co. (Mich.), 242 N. W. 836; see also note 110, A. L. R. 1276; and Hahn v. Home Life Ins. Co. (Tenn.), 84 S. W. (2d) 361. "The insurer has the opportunity to have the language of the contract selected with great care and deliberation by experts and legal advisers acting exclusively in its interests, and it is responsible for any ambiguities found therein. . . . It is, therefore, well established that where the meaning of a policy provision is doubtful or susceptible of different constructions, the policy should be construed strictly against the insurer and liberally in favor of the insured." [Henderson v. Massachusetts Bonding & Ins. Co., 337 Mo. 1, 84 S. W. (2d) 922.] If it had been intended to include "asphyxiation" from gas within the exception in the policy, it could easily have been so clearly stated as to leave no room for doubt or construction. [See wording of policy in Lamar v. Iowa State Traveling Men's Assn. (Iowa), 249 N. W. 149.] ■
The test of the meaning, of words commonly used, should be their ordinary and popular meaning; and they should not be construed in the broadest sense possible to include meanings to which they would not be applied by most people. We agree with the Supreme Court of Michigan in the Kingsley case that "the natural obvious meaning of the word 'poison'—that understood by people at large"—would not include "asphyxiation" from inhaling carbon monoxide gas. The first definition of poison given in Webster's New International Dictionary is: "A potion containing a noxious or deadly ingredient; also such ingredient." We think the term is most commonly used in that manner. [Webster's definition of Asphyxia says nothing about poison; see also discussion in U. S. Mutual Accident Assn. v. Newman (Va.), 3 S. E. 805.] The nature of carbon monoxide gas, and how it operates to produce its effects, are not matters of which courts can take judicial notice, but were proper subjects of expert testimony. [See Smith v. Harbison-Walker Refractories Co., 340 Mo. 389, 100

S. W. (2d) 909, l. c. 921.] We hold that it was not error to submit this question to the jury.

Defendant also says that it is not liable on the double indemnity agreement because it required that accidental death, covered thereby, must have "occurred during the premium paying period, before default in the payment of any premium." Defendant says that, under the ruling in Heuring v. Central States Life Ins. Co., 232 Mo. App. 731, 120 S. W. (2d) 176, the policy lapsed because Cleaver did not make payment of the premium due July 6, 1934, and those due quarterly thereafter, unless they were properly made for him under the automatic premium loan provision of the policy. If this provision is invalid, under the Missouri nonforfeiture statutes (Secs. 5741-5744, R. S. 1929, 6 Mo. Stat. Ann. 4388-4397), as held in the Heuring case, then Cleaver's insurance became temporary (term) insurance in 1934 for "the face amount insured by the policy" and continued as such until after his death; but the double liability agreement terminated when such extended insurance began. [Smith v. Equitable Life Assurance Society (Mo. App.), 107 S. W. (2d) 191; Valenti v. Prudential Ins. Co. (8th U. S. C. C. A.), 71 Fed. (2d) 229.] However, if the automatic premium loan provision is valid then all premiums were paid (advanced by defendant for Cleaver) "which became due under said policy up to February 4, 1939, the date of the insured's death;" and the whole policy, including the double indemnity agreement, remained in force.

This automatic premium loan provision, "the inclusion of which clauses or benefit in said policy had been requested by the insured in his application therefor," was, as follows:

"Any premium due hereon after three full years' premiums have been paid and remaining unpaid on the last day of grace will be advanced by the company as a loan against this policy if written request from the insured, has been received at the Home Office when application is made for this policy or while this policy is in force, without further action by the insured and provided the cash value of the policy at the end of the period which such advanced premiums will cover is at least equal to the amount of such premium and interest thereon, together with any outstanding indebtedness hereon to the company. Subsequent premiums will be advanced from time to time as they fall due under like conditions. Any indebtedness thus created will be a first charge against the policy ranking in priority to the claim of any beneficiary or assignee. If the cash value or balance thereof be not sufficient to pay an entire premium and interest it shall be used to pay a semi-annual or quarterly premium if sufficient to do so.

"Such premium loans shall be subject to the same terms and conditions as cash loans, except that assignment of the policy shall not be required. Request for such premium loans may be revoked in

writing by the insured at any time but such action shall not affect any loan that may have been previously made hereunder. The insured may resume payment of premiums at any time while this policy is thus carried in force without medical examination.''

Thus, the following question is presented for decision: Is it necessary for an insured to pay each premium himself out of his funds, or by borrowing each time from the company *at the time* it must be paid, in order to prevent the commutation of his policy to term insurance (or to one of the other statutory options if such is provided upon default) by operation of the nonforfeiture statutes? or (otherwise stated): Do the nonforfeiture statutes prevent the insured from making an agreement with the insurer, *in advance* of the time when any premium is due and before a policy reserve value has been created, for such insurer to advance such amounts as may be necessary to pay any premium, left unpaid by the insured at any time on the last day of any grace period, and charge the same as a loan against the policy?

It is definitely settled ''that the provisions of our nonforfeiture statutes are mandatory; that they are a part of every insurance policy issued in this State whether mentioned therein or not; that they cannot be kept out of any policy, abrogated, waived, or contracted away by any agreement in the policy or made thereafter by the parties prior to default; that, while they do not limit the rights of the insured solely to extended insurance as provided for in Section 5741 (Mo. Stat. Ann., sec. 5741, p. 4388) because Section 5744 (Mo. Stat. Ann., sec. 5744, p. 4395) permits a choice between four methods for application of the reserve or cash value upon default of a premium payment, freedom of contract between the parties is limited to a choice between these authorized options; and that, if any advance agreement is made for disposition of the reserve upon default, for which statutory authority cannot be found, it is unenforceable and void.'' [State ex rel. Heuring v. Allen, 342 Mo. 81, 112 S. W. (2d) 843.]

In the last Heuring case (120 S. W. (2d) l. c. 182) the Court of Appeals held that ''the special automatic loan privilege clause provides a method for applying the reserve not contemplated in Section 5741, and as the method provided in said clause does not fall within the purview of any of the four exceptions of Section 5744, it is void.''

Section 5741, R. S. 1929 (6 Mo. Stat. Ann. 4388) provides:

''No policies of insurance on life hereafter issued by any life insurance company authorized to do business in this state shall, after payment upon it of three or more annual payments, be forfeited or become void by reason of non-payment of premiums thereon, but it shall be subject to the following rules of commutation, to-wit: The net value of the policy, when the premium becomes due and is not

paid, shall be computed upon the actuaries' or combined experience table of mortality with four per cent interest per annum, *and after deducting from three-fourths of such net value the unpaid portion of any notes given on account of past premium payments on said policy and any other indebtedness to the company secured by said policy,* which notes and indebtedness shall then be canceled, the balance shall be taken as a net single premium for temporary insurance (extended insurance).'' (The rest· of the Section deals with amounts of such insurance, its term, etc.)

In the original act (Laws 1879, p. 130), instead of the above wording which we have italicized, the deduction authorized for indebtedness was, as follows: ''And after deducting from three-fourths (¾) of such net value *any notes or other indebtedness to the company, given on account of past premiums, payments on said policy* issued to the insured, which indebtedness shall then be canceled, the balance shall be taken as a net single premium for temporary insurance.'' This original wording remained in the statute until 1903. [Sec. 5983, R. S. 1879, Sec. 5856, R. S. 1889, Sec. 7897, R. S. 1899 (the 1899 section read ''or other *evidence of* indebtedness''), Laws 1903, p. 208.] The 1903 amendment changed this to authorize the deduction of ''any notes given on account of past premium payments on said policy issued to the insured, *and any evidence of indebtedness to the* company.'' The present broader provision, namely: *''And any other indebtedness to the company secured by said policy''* was added in 1923. [Laws 1923, p. 233.]

The effect of the original language was ruled in Smith v. Mutual Benefit Life Ins. Co., 173 Mo. 329, 72 S. W. 935; Burridge v. New York Life Ins. Co., 211 Mo. 158, 109 S. W. 560; and Liebing v. Mutual Life Ins. Co., 269 Mo. 509, 191 S. W. 250. In the Burridge case, this court stated its construction of the original language of the act and the effect of the 1903 amendment, as follows:

''Attending to that section as it read when the policy issued and when the insured died, it will be observed that the net value of the policy is to be computed. Then from three-fourths of such net value there is to be taken away—what? All indebtedness? Not at all. There shall be taken away 'any notes or other evidence of indebtedness to the company, *given on account of past premium payments on said policies.'* The residue, if any, then goes automatically to the purchase of temporary or extended insurance. In the Smith case there was a loan made on the strength of the reserve value of the policy. Part of the loan was on account of past premium payments, but part of it was for a present cash loan at large. If the whole of the loan was to ·be deducted from the net value, then there was no purchasing power left to the net value, and *ergo,* no extended insurance in the Smith case. But, on the other hand, if only that part of the loan made· on account of past premium payments was to be deducted from

the net value before the purchase of extended insurance, then there was a residuum left to be applied under the statute to the purchase of such extended insurance, and, in that event, the policy was alive and the company liable. In that case, therefore, the scope and meaning of that clause of our nonforfeiting insurance statute was held in judgment in the stiffest sense and this court decided that the statute was mandatory; that the *character* of the indebtedness to be deducted from the net value before applying the residue to the purchase of temporary or extended insurance must be looked to and was limited by the clear words of the statute 'to notes or other evidences or indebtedness to the company, given on account of past premium payments' on the policy issued to the insured; and did not include notes and evidences of indebtedness arising in other ways. . . .

"Seven days after the decision in the Smith case, and presumably on account of it, the Forty-second General Assembly, then in session, amended Section 7897, supra (Laws 1903, p. 208, supra). The significance of the amendment can be seen at a glance in Section 1 of that act hereinbefore set forth. It struck from the body of the law the statutory restriction upon the character of the notes and other evidence of indebtedness to be deducted from the net value before applying it to the purchase of temporary insurance, and in it wrote in lieu thereof a broader provision, to-wit, a clause providing that there should be deducted from this net value not only 'any notes given on account of past premium payments on said policy issued to the insured,' but, also, 'any other evidence of indebtedness to the company.' It becomes plain, then, that if the policy in suit had been issued and the loan made under the provisions of the amendment of 1903, the case would present a boneless contention. But the Act of 1903 was not retrospective under settled rules of law."

Therefore, it is apparent that the still broader provision of the 1923 Amendment to Section 5741 was not construed by the cases cited and relied upon by the Court of Appeals in the Heuring case. The only cases cited which were decided after that Amendment were: State ex rel. Clark v. Becker, 335 Mo. 785, 73 S. W. (2d) 769; and Gooch v. Metropolitan Life Ins. Co., 333 Mo. 191, 61 S. W. (2d) 704. Both of these cases construed policies issued before the 1923 Amendment, and neither considered the question presented in this case.

No one has ever questioned the right of a policyholder to borrow money from the insurer on his policy as security. What has been questioned (and held invalid under the original language of this nonforfeiture statute) was, whether any valid provision could be made for any deduction after default, from the reserve value (three-fourths thereof) required to be used for term insurance premium, except indebtedness for past premium payments. Now the statute authorizes such deductions not only for "notes given on account of past premium

payments on said policy," but also for "any other indebtedness to the company secured by said policy." Does it make any difference how or when, "indebtedness to the company secured by said policy," is incurred? There is nothing in the statute that says so. The automatic premium loan provision of this policy was an agreement that money, to pay any premium (after three years' premiums have been paid) unpaid on the last day of grace, "will be advanced by the Company as a loan against this policy . . . subject to the same terms and conditions as cash loans" (except assignment), which the company likewise agreed to make "on the sole security of this policy . . . at any time after three full years' premiums have been paid." Where is there any conflict between the present statute and this policy provision? Surely an advancement by the company to pay a premium due from the insured "as a loan against this policy" and "on the sole security of this policy" is "indebtedness to the company secured by said policy." We can see no reason why it should not be as valid as a cash loan made to the insured to enable him to buy an automobile or to pay off a mortgage on one; or, in bygone days, a house or farm. There is no limitation in the statute saying that an agreement for a loan for any purpose cannot be made in advance of the time when the money is to be furnished.

▮ It has been the policy of our insurance laws, as indicated by the original language of this statute, and the cases construing its meaning prior to the 1903 Amendment, to permit deductions, from the reserve value available for term insurance, only for indebtedness incurred for past premium payments, which had kept the policy in force. Under the still broader language of the 1923 Amendment, must we say that there can be no deduction for indebtedness unless the insured authorized such indebtedness to be secured by his policy after the accrual of the obligation he desired to pay? This would be to say that "any other indebtedness to the company" should be recognized (and could be deducted) except indebtedness incurred under agreements to make advancements for premiums which would continue the policy in force. There is no basis in the present statute for any distinction, based upon the time when indebtedness is incurred, and this case well illustrates why no such strained construction should be attempted. Here insured had valuable rights, as long as he kept this policy in force, which he would lose whenever there was a default of payment of a premium, because such rights would not be continued in the term insurance given him under the nonforfeiture statute. These rights were to keep the additional amount of insurance provided for accidental death, and to continue his policy in force (after all of the reserve value had been used to pay premiums under the automatic loan agreement) by merely resuming payment of premiums thereafter. He could thus keep his original policy as written, instead of making application for reinstatement, requiring a new medical

examination, or taking out new insurance at a higher premium than the rate applicable to his original age. If the company, in accordance with the automatic premium loan agreement, on the last day of each grace period, could legally advance as a loan against this policy the amount necessary to pay each premium when due (but not yet in default), there never was any premium on this policy which became *"due"* and was *"not paid"*, and there was never any "default of premium." [Mutual Benefit Life Ins. Co. v. Commissioner of Insurance, 151 Mich. 610, 115 N. W. 707; Barthel v. Sovereign Camp of W. O. W., 230 Mo. App. 247, 93 S. W. (2d) 285; James-Automatic Premium Loan Policies and the Non Forfeiture Statutes, 5 Mo. Law Rev. 331.] If these automatic premium loans were not prohibited as loans, how could it be reasonably argued that such loans did not pay the premiums when as here the reserve was sufficient to do so? and: If each premium that ever came due was thus paid on the last day of the grace period, how could any of them ever have been in default? We have been unable to discover any statutory limitation upon making loans to be secured by an insurance policy; nor any requirement that they must be made at any particular time, in any specified way, or within any specific period in order to be deductable, under the present nonforfeiture statute, upon default of premium; and there is no longer any limitation upon the purpose for which the money is required to be used to make them deductable.

It was not even the original purpose of the nonforfeiture statutes to compel policyholders to use their reserve values only to buy certain types of insurance after default, because there was always provision for taking the cash surrender value instead of any further insurance. In explaining the reasons for enactment of our nonforfeiture statutes, this Court, en Banc, said, in Westerman v. Supreme Lodge K. of P., 196 Mo. 670, 1. c. 711-712-713, 94 S. W. 470:

"The Supreme Court of Massachusetts, the State from which it is claimed this statute was borrowed, in Connecticut Ins. Co. v. Commonwealth, 133 Mass. 1. c. 164, clearly indicates the reasons upon which the enactment of the nonforfeiture law was predicated. In discussing this subject it was there said:

" 'The simplest form of carrying on the business of life insurance would be for the company to charge the policy-holder each year with the sum which it costs to insure him for that year, which can be ascertained with reasonable certainty by the aid of the accepted tables of mortality. In such case, the relation between the parties would be merely that of insurer and insured. But the general practice of insurers is, instead of charging such sums, which would increase from year to year, to ascertain what these sums would average each year throughout an average life, and to charge each year such average sum. The necessary effect of this practice is that the insured, during the earlier years of the running of his policy, pays more than it costs

to insure him, and thus the company accumulates from year to year a fund which in equity is held for the benefit of the policy-holders. It is this feature of the business which gives existence to 'net values' within the meaning of our statutes. . . . If the insured violates his contract and forfeits his policy, the company cannot treat the accumulation upon his policy as its property, but holds it for his benefit.' . . .

" 'The same motives which led to the enactment of the statute in Massachusetts doubtless led to its enactment in the State of Missouri; that is to say, the Legislature intended to secure to policy-holders the benefit of the reserve on their policies if they had paid 'two full annual premiums,' and not permit the reserve to be forfeited or appropriated by the insurer. It is a well-known fact that the forfeiture of such reserve values for non-payment of premiums had become a source of great profit to insurance companies, because the premiums which they were in the habit of exacting from the insured on life policies were so fixed as to be considerably in excess of the cost of simply carrying the risk from one annual period to another so as to accumulate a reserve. The Legislature deemed it inequitable to deprive the insured of the benefit of payments which he had actually made.' "

If a policyholder is allowed to draw out or borrow all of his reserve value for his own use, surely it cannot be said that he has been deprived of it; and that is the reason our statute was amended to authorize loans, for any purpose the insured desired, and their deduction from the reserve value. Therefore, we find nothing in the idea of using the reserve value to pay future maturing premiums in order to keep the policy in force, as provided by this revocable automatic premium loan agreement, which is in conflict with or defeats the true purpose of the nonforfeiture statutes. As above shown, such purpose was to prevent a forfeiture of all the reserve value by providing for the insured to get the benefit of at least three-fourths of it. Certainly, when this reserve value (all of it here instead of three-fourths) is advanced for the benefit of the insured as loans to him to pay premiums, which he agreed to pay (at the original premium rate) to keep his policy in force, then his reserve value has not been forfeited but he has had the full benefit of it by having it used according to his directions for the very purpose he directed it to be used. Our conclusion is that this automatic premium loan agreement did not provide for a consequence of default, prohibited by the nonforfeiture statutes, but provided instead a way to make loans secured by the policy in time to pay premiums, while they were still due and payable, in order to prevent a "default of premium." We, therefore, hold that Heuring v. Central States Life Ins. Co., 232 Mo. App. 731, 120 S. W. (2d) 176, should be overruled; that there was no "default of premium" on the Cleaver policy; that it never became subject to commutation to term insurance; but that all of its terms

and agreements remained in full force and effect on the date of the insured's death; and that plaintiff was entitled to recover the $10,000 accidental death insurance, therein provided, with interest.

Defendant finally contends that there was no issue made for the jury on vexatious refusal to pay the double indemnity benefit of the policy. Defendant says: "In view of the previous holding of the Springfield Court of Appeals in Heuring v. Central States Life Ins. Co., 232 Mo. App. 731, 120 S. W. (2d) 176, that the automatic premium loan clause of this policy was in contravention of Section 5741, R. S. Mo. 1929, the appellant was unquestionably justified in refusing to pay the double indemnity benefit of this policy on the ground that that benefit was not in force at the time of the insured's death because of a default in the payment of a premium due thereunder long prior to death." We think defendant's position is correct. In Camdenton Consolidated School District v. New York Casualty Co., 340 Mo. 1070, 104 S. W. (2d) 319, we hold that the statutory penalty (Sec. 5929, R. S. 1929, 6 Mo. Stat. Ann. 4515) would not be imposed where defendant's contention was supported by a United States Circuit Court of Appeals' decision. Here the only decision on the question, in this State, held that the provision, upon which plaintiff relied as keeping the policy in force, was void. Certainly, this decision created a debatable legal question as to what kind of insurance was in force at the time of insured's death. Defendant promptly paid the amount for which it would be liable, in any event, under an agreement that no claims or defenses of either party would be thereby prejudiced. Vexatious refusal to pay contemplated by the statute is not to be deduced from the final result reached, but must be supported by a showing of obstructing a beneficiary by refusing to pay without reasonable or probable cause or excuse. [Camdenton Consolidated School District v. New York Casualty Co., supra, and cases therein cited.] We hold that a reasonable basis for an honest difference of opinion, in good faith, appeared herein as a matter of law.

The cause is remanded with directions to strike from the judgment the items of $260, as damages, and $1000, as attorney's fee; and to enter a new judgment for plaintiff, as of date of the original judgment, for $10,240, the same to bear interest from that date until paid at the rate of six per cent per annum. *Bradley* and *Dalton, CC.,* concur.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All the judges concur.