Alice SEABAUGH, Plaintiff-Appellant,

v.

Jay SISK, Administrator of the Estate of Charles Junior Webb, Deceased, Defendant,

and

American National Fire Insurance Company, a corporation, Defendant-Respondent.

No. 8576.

Springfield Court of Appeals.

Missouri.

Feb. 16, 1967.

Motion for Rehearing or to Transfer Denied March 14, 1967.

Application to Transfer Denied May 8, 1967.

Dempster, Edwards & Robison, Robert A. Dempster, James R. Robison, Sikeston, for plaintiff-appellant.

Manuel Drumm, Sikeston, for defendant-respondent.

STONE, Presiding Judge.

This action arises out of an ill-fated deer-hunting expedition on which plaintiff, her husband, a male hunting companion and his teen-age son, all residents of Sikeston, Missouri, embarked before daybreak on Sunday, October 13, 1963. About one hour later while it was yet dark, tragedy struck when the 1958 Pontiac coach owned and driven by plaintiff's husband, then west-bound on its right (the north) side of a straight, level stretch of the two-lane, 24-foot concrete roadway of U. S. Highway 60 in Scott County, Missouri, collided "approximately headon" with an eastbound 1954 Chevrolet coach owned and driven by Charles Junior Webb. The crushing impact resulted in the death of Webb, plaintiff's husband and the teen-age son of his hunting companion, and in injuries to plaintiff and the companion.

Plaintiff's amended petition, upon which she proceeded to trial before the court (a jury having been waived), was in three counts. On Count I, she was awarded for her bodily injuries a judgment in the sum of $5,000 against defendant Jay Sisk, as administrator of the estate of Charles Junior Webb, deceased. On Count II, she was awarded for the alleged wrongful death of her husband a judgment in the sum of $25,000 against defendant Sisk as such administrator. On Count III, she prayed for, but was denied, a judgment in the sum of $5,000 against defendant American National Fire Insurance Company, on the theory that Webb had been driving an "uninsured automobile" and that she, as an insured under the "family automobile policy" issued by defendant American National to her husband on the 1958 Pontiac coach, was entitled to the maximum permissible recovery by one person under the uninsured motorists coverage afforded by that policy. Defendant Sisk filed no after-trial motion and took no appeal, so the case is here solely on plaintiff's appeal from the adverse judgment on Count III, thereby delivering into our hands another of the perplexing problems with which uninsured motorists coverage is pregnant.

The American National policy, on which plaintiff seeks to recover, defines an "uninsured automobile" as "(a) an automobile or trailer with respect to the ownership, maintenance or use of which there is, in at least the amounts specified by the financial responsibility law of the state . . ., no bodily injury liability bond or insurance policy applicable at the time of the accident . . . [hereinafter referred to as the *no policy definition*], *or* with respect to which there is a bodily injury liability bond or insurance policy applicable at the time of the accident but the company writing the same denies coverage thereunder [hereinafter referred to as the *denial of coverage definition*] or (b) a hit-and-run automobile . . . ." (All emphasis herein is ours.)

At the time of the accident under consideration, i. e., on October 13, 1963, an insurance policy theretofore issued by Crown

Insurance Company of Huntington, West Virginia, afforded bodily injury liability coverage in the amounts then required by our Motor Vehicle Safety Responsibility Law [V.A.M.S. § 303.030, subd. 5] with respect to any person legally responsible for the use of Webb's 1954 Chevrolet coach. On October 18, 1963, attorney Dempster wrote Dillon Claims Service, "insurance adjusters" at Cape Girardeau, "as I (Dempster) had been informed they were adjusting for Crown," that he represented plaintiff and also the hunting companion and his teen-age son (apparently then still alive) in their respective claims against Webb. By letter dated October 21, 1963, which showed "cc Crown Insurance Company, St. Louis, Missouri," Dillon acknowledged receipt of Dempster's letter and added, "I will meet with you in the near future to discuss this matter"; and, as Dempster testified upon trial, "Mr. Ken Dillon did discuss it with me at one time."

During January, February and March, 1964, Dempster corresponded with one Henry Tager in Crown's "Executive Offices" at Clayton, Missouri, in an unsuccessful effort to arrange for a personal conference at a mutually convenient time. Some of this correspondence was produced and offered in evidence by Dempster. For the purposes of this discussion, suffice it to say that Tager's replies were courteous, evidenced no effort or inclination on the part of Crown to deny coverage, expressed Tager's willingness to confer with Dempster, and in each instance coupled a statement of Tager's "unfortunate" inability to do so on the date last suggested by Dempster with an invitation for him to come at some later time, e. g., "in the early part of March" or "sometime the week of March 23, 1964." Dempster did talk with Tager "on the telephone a time or two, one time when I was in St. Louis." Upon trial, Dempster said that he had written Crown "because I had knowledge that there was a policy of insurance in existence on the Webb motor vehicle."

On April 2, 1964, Jay Sisk was appointed as "personal representative and administrator of the estate of Charles Junior Webb, deceased," by and in the Probate Court of Scott County, Missouri. V.A.M.S. § 537.020. On the following day, to wit, on April 3, this action was instituted in the circuit court by the filing of plaintiff's petition against defendant Sisk, as such administrator; and, on April 4, service was obtained upon said defendant. On April 7, Sisk mailed to Crown's office at Clayton, Missouri, a certified copy of his appointment by the probate court and the summons and petition herein. Crown made no response and did not contact Sisk with respect to defense of the instant suit.

Plaintiff's attorney Dempster received during May 1964 a long printed notice (received in evidence without objection) dated at Huntington, West Virginia, on May 7, 1964, from "Harlan Justice, Insurance Commissioner State of West Virginia and Receiver" to "the Policyholders, Creditors, Stockholders, and All Other Persons Interested in the Affairs of Crown Insurance Company, of Huntington, West Virginia, a West Virginia corporation." Those portions of the notice relevant to this discussion were to the effect (a) that, by order of the Circuit Court of Cabell County, West Virginia, entered on May 7, 1964, Justice in his official capacity as Insurance Commissioner had been directed "to take possession of the property and to liquidate the business of Crown," (b) that, by the aforesaid order, Crown's charter as a ·West Virginia corporation "is forfeited, surrendered and annulled" and the rights and liabilities of Crown and of all persons under insurance and other contracts "ceased and are fixed" as of twelve o'clock midnight on May 20, 1964, (c) that "all persons having any unsatisfied claims or demands of any character against [Crown] are hereby required to file with, deliver, and present the same in writing duly verified" to Justice within four months, to wit, on or before September 7, 1964 (d) that "all persons against whom actions are now pending con-

cerning which [Crown] may be liable on its policies and which have been defended up to the date of liquidation order on their behalf by an attorney employed or retained by [Crown], are advised that the employment or retainer of the said attorney has been terminated by the entry of the order of liquidation," and (e) that "liabilities will be determined as to all claims duly presented and all assets will be distributed according to the Insurance Law of the State of West Virginia." On cross-examination, Dempster frankly conceded that instant plaintiff had filed a claim with Justice, although "we have heard nothing from it."

■ On this state of facts, it is clear that the Webb Chevrolet was not an "uninsured automobile" under the *no policy definition* in the American National policy on which plaintiff seeks to recover, i. e., an automobile on which there was "no bodily injury liability bond or insurance policy applicable at the time of the accident." Swaringin v. Allstate Insurance Co., Mo.App., 399 S.W. 2d 131; Stone v. Liberty Mutual Insurance Co., Tenn.App., 397 S.W.2d 411; Hardin v. American Mutual Fire Ins. Co., 261 N.C. 67, 134 S.E.2d 142, 147–148(4, 5); Rice v. Aetna Casualty and Surety Co., 267 N.C. 421, 148 S.E.2d 223, 225(3); Federal Insurance Co v. Speight, D.C. S.C., 220 F. Supp. 90, 94–95(5). But plaintiff insists that the Webb Chevrolet did become an *"uninsured automobile" within the meaning* of the *denial of coverage definition,* i. e., an automobile on which there was a bodily injury liability insurance policy "applicable at the time of the accident but the company writing the same *denies coverage* thereunder." Before proceeding to a discussion of that contention, we emphasize preliminarily that plaintiff's counsel specifically disavow any belief "that the definition provided by the policy is ambiguous."

■ Reduced to its simplest terms, the determinative question here becomes wheth-

er Crown *denied coverage* by going into receivership during the seventh month after the accident of October 13, 1963, and failing to defend Webb's administrator against Counts I and II of plaintiff's petition. Counsel have cited, and we have found, no reported Missouri case defining the critical words *"denies coverage"* or dealing with the precise problem here presented.[1] However, both the verb "deny" and the noun "coverage" are familiar words frequently used and, in the absence of any indication that the parties to the policy contract entertained a contrary intention, should be accorded their plain and ordinary meaning. Cleaver v. Central States Life Ins. Co., 346 Mo. 548, 554, 142 S.W.2d 474, 477(2), 129 A.L.R. 1094; Allen v. Globe-Democrat Publishing Co., Mo., 368 S.W.2d 460, 466(6). See Kisling v. MFA Mutual Ins. Co., Mo.App., 399 S.W.2d 245, 253 (11); Katz Drug Co. v. Kansas City Power & Light Co., Mo.App., 303 S.W.2d 672, 680(8).

■ To "deny" is "to refuse to grant; to withhold." Webster's New International Dictionary (2nd Ed.), p. 700. In the field of insurance, "coverage" refers to "[t]he aggregate of risks covered by the terms of a contract of insurance." Id., p. 613. Or, as several courts have said, " 'coverage' means 'the sum of risks which an insurance policy covers.' " Federal Life Ins. Co. v. Wells, 98 Colo. 455, 56 P.2d 936, 938; Freimuth v. Glens Falls Ins. Co., 50 Wash.2d 621, 314 P.2d 468, 471(3); Government Employees Ins. Co. v. Woods, 59 Wash.2d 173, 367 P.2d 21, 26(6). In short, "coverage" ordinarily refers to the risks or hazards assumed by the insurer and covered by the policy. Both of the policies in evidence here, i. e., the policy issued by defendant American National on which plaintiff seeks to recover and that issued by Crown on the Webb Chevrolet, are generously flecked with the terms "coverage" and

---

1. In Swaringin v. Allstate Insurance Co., Mo.App., 399 S.W.2d 131, the policy in suit did not contain the *denial of coverage definition,* and the determinative issue there presented and ruled was as to the alleged ambiguity of the *no policy definition.*

"coverages." Careful examination of both policies, with particular attention to the context in which those words appear, leaves us in no doubt but that they were used throughout both policies in their ordinary and usual sense. For example, on the "declarations page" of defendant American National's policy there is a column captioned "Coverages" under which are listed seven categories of risks or hazards, including "A. Bodily Injury Liability, B. Property Damage Liability . . . G. Uninsured Motorists," with parallel columns for "Limits of Liability" and "Premiums" which show, inter alia, that the policy afforded uninsured motorists coverage with limits of $5,000 for each person and $10,000 for each accident, for which a premium of $2 was charged. And that portion of the policy dealing with this coverage is prefaced by the bold-faced heading "Coverage G—Uninsured Motorists (Damages for Bodily Injury)."

All of the prior cases, still a mere handful in number, which have undertaken to define, or have turned upon the meaning of, the words "denies coverage" or the phrase "to deny coverage," have been reported within the past six years and all have arisen in states in which public policy theretofore had been formulated and declared in legislative enactments designed to provide compensation for innocent persons injured by negligent uninsured motorists, either by making uninsured motorist coverage mandatory in all automobile liability policies issued in those states (e. g., as in Virginia, North Carolina, South Carolina and California) or by establishing so-called unsatisfied claim and judgment funds (e. g., as in New Jersey and Maryland) or by setting up a statutory plan combining the features of the first two alternatives (e. g., as in New York).

Defendant American National leans heavily on Uline v. Motor Vehicle Accident Indemnification Corp., 28 Misc.2d 1002, 213 N.Y.S.2d 871, 874, where it was held that postaccident receivership of the tortfeasor's liability insurance carrier did not bring plaintiff Uline within the statutory provision permitting the filing of claims for benefits on account of injuries inflicted by "insured motor vehicles where the insurer *disclaims liability or denies coverage.*" Insurance Law, McKinney's Consol.Laws, c. 28, § 600. Pertinent to our inquiry are the following definitive statements in·the opinion: *"To deny coverage* is to·take the position that for some reason or other the policy does not encompass the particular accident. No such claim is made here. A *disclaimer of liability* usually arises where there is coverage, but because of some action on the part of the insured, the company refuses to respond. This refusal could be for lack of cooperation by the insured, fraud perpetrated by the insured on the company or serving late notice of the accident, just to mention a few. There is no disclaimer in the present case." 213 N.Y.S. 2d at 874(3, 4). The above-quoted definition of the phrase "to deny coverage" was commended as "accurate" in Rivera v. Motor Vehicle Accident Indemnification Corp., 44 Misc.2d 585, 254 N.Y.S.2d 480, 482, motion for leave to appeal denied 15 N.Y.2d 485, 258 N.Y.S.2d 1025, 206 N.E.2d 363 (1965). And both definitions in the foregoing excerpt from Uline, supra, were quoted with approval in Parrot v. Chiselko, 74 N.J.Super. 138, 180 A.2d 710, 714 (1962), and in Unsatisfied Claim and Judgment Fund Board v. Holland, 241 Md. 294, 216 A.2d 525, 528–529 (1966). Furthermore, it has been held that even the failure of a *solvent* insurer to defend a suit against one reported to have been an insured or to make any response to repeated inquiries as to the reason for its nondefense did not constitute either a denial of coverage or a disclaimer of liability. Application of DiStefano, 34 Misc.2d 68, 228 N.Y.S.2d 404.

Instant plaintiff relies principally upon State Farm Mutual Auto. Ins. Co. v. Brower, 204 Va. 887, 134 S.E.2d 277, where it was held that, by failing to defend the damage suit brought by Brower, State Farm's insured, against tortfeasor Mazza and to pay the judgment rendered therein,

Mazza's liability insurer in receivership "denie[d] liability" and thereby made the Mazza automobile "an uninsured motor vehicle" within the meaning of the denial of liability definition in the Virginia statute. In the course of reaching that conclusion, the court, after a proper definitive statement that "[t]o deny means to withhold, to refuse to grant," suggested that "[a] person in distress is denied help when one who hears his cries says nothing but walks away." 134 S.E.2d at 280. However, it seems to us that the position of an insolvent insurer in receivership is more nearly like unto that of one who hears the cries of another in distress but, already prostrate and impotent himself, simply cannot respond. But that aside, the overriding consideration in State Farm, supra, appears to have been that "the Virginia uninsured motorist legislation is remedial in nature" and "'is to be liberally construed so that the purpose intended may be accomplished.'" 134 S.E.2d at 281(4).

After pointing out that the *South Carolina* mandatory uninsured motorist statute had been modeled after the Virginia statute and after expressing the view that the holding in State Farm, supra, "is consistent with the language of the statute and with its spirit and purpose," the Supreme Court of South Carolina reached the same conclusion in North River Insurance Co. v. Gibson, 244 S.C. 393, 137 S.E.2d 264 (1964), also cited by instant plaintiff. In this connection, it is worthy of note that the South Carolina statute, theretofore containing a *no policy definition* and a *denial of coverage definition* of an "uninsured motor vehicle," had been amended in 1963 (*after* the accident out of which North River, supra, arose but *before* determination of that case) by including a third definition, to which we refer as an *insolvency definition,* to wit, "a motor vehicle as to which . . . there was such [liability] insurance, but the insurance carrier who wrote the same is declared insolvent, or is in delinquency proceedings, suspension, or receivership, or is proven unable fully to respond to a judg-

ment." 1963 Code Supplement § 46–750.31 (3) (c). We are aware that in North River, supra, the Supreme Court of South Carolina discovered a trail of escape from the principle that a statute as amended should be construed on the theory that the legislature intended to accomplish something by the amendment [State v. Chadeayne, Mo. (banc), 323 S.W.2d 680, 684 (2); State ex rel. Klein v. Hughes, 351 Mo. 651, 173 S.W.2d 877, 880(6)] and arrived at the conclusion that "the purpose and effect of the amendment was to clarify rather than to broaden the coverage afforded by the statute" prior to amendment. 137 S.E.2d at 267. However, we observe also that, subsequent to the 1963 amendment but prior to North River, supra, a contrary result had been reached in Federal Insurance Co. v. Speight, D.C.S.C., 220 F.Supp. 90, that court more logically and realistically (so it seems to us) having believed "[i]t . . . apparent from this [statutory] amendment that the Legislature realized that the existing law failed to provide for a situation where a motorist . . . was insured at the time of the collision, but his insurance carrier subsequently became insolvent before the claimant could collect his damages" [220 F.Supp. at 95] and having construed the amended statute on the above-noted theory that the legislature had intended to accomplish something by the amendment.

The *North Carolina* statute making uninsured motorist coverage mandatory in all automobile liability policies issued in that state [G.S. § 20–279.21] was amended in 1965 to include an *insolvency definition* of an uninsured motor vehicle, to wit, "an insured motor vehicle where the liability insurer thereof is unable to make payment with respect to the legal liability within the limits specified therein because of insolvency." Chapter 156, Session Laws of 1965. The same amendatory act included other appropriate provisions, i. e., (a) affording this statutory "insolvency protection" only "where the liability insurer of the tort-feasor becomes insolvent within

three years" after the date of accident, and (b) giving the uninsured motorist carrier the right of subrogation against the tortfeasor's insolvent liability carrier. Although unnecessary to determination of that case, the Supreme Court of North Carolina commented in Buck v. United States Fidelity & Guaranty Co., 265 N.C. 285, 144 S.E.2d 34, 37–38 (1965), that the above amendatory act would "preclude the result" theretofore reached by the same court in Hardin v. American Mut. Fire Insurance Co., 261 N.C. 67, 134 S.E.2d 142 (1964), where it had been decided that the tortfeasor's automobile "*did not become* an 'uninsured automobile' by reason of the subsequent receivership and insolvency of the liability insurer." 144 S.E.2d at 37.

The only other case found by us which deals with the question under consideration is Katz v. American Motorist Ins. Co., Cal. App., 53 Cal.Rptr. 669 (1966), where the court followed State Farm, supra, in deciding that "an insurer who becomes insolvent 'denies coverage' within the meaning of [West's Ann.Insurance Code] section 11580.2, subdivision (b)" [53 Cal.Rptr. at 672(4, 5)], the California statute containing a *denial of coverage definition* of an "uninsured motor vehicle." Again, the rationale was that the cited statute was "a part of a pattern of statutes . . . 'designed to give monetary protection'" to innocent persons injured by negligent uninsured motorists, that "[s]uch statutes must be liberally construed to carry out this objective," and that "[t]he statutory objective is not attained by giving the injured person a claim against an insolvent." 53 Cal.Rptr. at 672. Ergo, insolvency was a denial of coverage.

■ However, none of the cited cases reflecting judicial efforts to implement and attain statutory objectives reach or rule our case. For, in Missouri uninsured motorist coverage is permissive and has not been a subject of special legislative attention and action; and, in the absence of inhibition by statute or public policy, the parties to an insurance policy are free to make their own contract containing such provisions as the contracting parties are willing to accept and adopt. Kisling v. MFA Mutual Ins. Co., supra, 399 S.W.2d at 252–253(10), and cases there cited.

■ "Denies coverage" is not a linguistic "Mother Hubbard" within whose enveloping warmth may be gathered all circumstances, conditions and contingencies arising subsequent to an accident which might prevent an injured person having uninsured motorist coverage from making full financial recovery from the tortfeasor. We regard the hereinbefore-quoted definitions in Uline, supra, 213 N.Y.S.2d at 874 (approved in the cited New Jersey and Maryland cases), as accurate and sound. But, even if "*denies coverage*" as used in defendant American National's policy be considered as including all that was embraced in the Uline definitions of "*to deny coverage*" (i. e., "to take the position that for some reason or other the policy does not encompass the particular accident") *and "disclaimer of liability"* (i. e., "there is coverage, but because of some action on the part of the insured, the company refuses to respond" as "for lack of cooperation by the insured, fraud perpetrated by the insured on the company or serving late notice of the accident"), there was not a scintilla of evidence that Crown denied coverage under the policy issued to tortfeasor Webb or that it failed to afford protection to defendant Sisk, Webb's administrator, for any reason other than that it had become insolvent and had been placed in receivership. Crown's failure to defend was *a breach of contract, not a denial of liability*. Application of DiStefano, 34 Misc.2d 68, 228 N.Y.S.2d 404. In our considered judgment, Crown's insolvency and its failure to defend Sisk are neither to be equated with, nor reasonably to be found within the legitimate connotations of, "*denies liability*."

■ "Courts are without authority to rewrite contracts, even insurance contracts, although it may appear that in some respects they operate harshly or inequitably as to one of the parties . . . ." Prange v. International Life Ins. Co. of St. Louis, 329 Mo. 651, 661, 46 S.W.2d 523, 526(5), 80 A.L.R. 950; State Mut. Life Assur. Co. of Worchester, Mass. v. Dischinger, Mo., 263 S.W.2d 394, 402(6); Lachterman v. Mutual Ben. Health & Acc. Ass'n., Mo. App., 60 S.W.2d 646, 648(3).

The judgment for defendant American National on Count III of plaintiff's petition is affirmed.

HOGAN and TITUS, JJ., concur.

On Motion for Rehearing or to Transfer

PER CURIAM.

■ In the interval since our opinion was handed down, Pattani v. Keystone Insurance Co., 209 Pa.Super. 15, 223 A.2d 899 (Nov. 1966) has been reported. The opinion in Pattani disposed of two consolidated cases which involved the same determinative issue as that in the case at bar and, by the same reasoning, reached the same conclusion as we have. As in Pattani, supra, 223 A.2d at 902: "The court is well aware of the detriment suffered by the innocent appellants in this decision. Any broadening of the coverage provided by such [uninsured motorists] insurance must, however, be the result of legislation or contractual bargaining, and not by this court."

Instant plaintiff's motion for rehearing or, in the alternative, to transfer this cause to the Supreme Court of Missouri is overruled.

All concur.