Plaugher *v.* American Viscose Corporation,
Appellant.

Argued November 17, 1942.

Before KELLER, P. J.,
CUNNINGHAM, STADTFELD, RHODES, HIRT and KEN-
WORTHEY, JJ.

*J. H. Ward Hinkson,* for appellant.

*Henry Temin,* with him *Todd Daniel,* for appellee.

OPINION BY KELLER, P. J., January 28, 1943:

This appeal is from a judgment on an award for compensation arising under the Occupational Disease Compensation Act of July 2, 1937, P. L. 2714, 77 PS §1101. The matter first came before us in an appeal by the claimant upon a procedural matter, 147 Pa. Superior Ct. 372, 24 A. 2d 698. The present appeal by the employer is on the merits. The Commonwealth, which was ordered to pay nine-tenths of the award, pursuant to section 7 of said Act, has not appealed.

The Occupational Disease Compensation Act of 1937 is a supplement to the Workmen's Compensation Act of 1915, P. L. 736, and the procedure prescribed in that Act is made applicable to the supplement, unless clearly inconsistent (sec. 3). But it must not be overlooked that there is a basic and vital distinction between the two statutes. The Workmen's Compensation Act is restricted to disability or death resulting from injury received by the employee, *by accident,* while in the course of his employment. An accident, within the meaning of that Act, is an event that takes place without one's foresight or expectation; an undesigned, sudden and unexpected event: *Lacey v. Washburn & Williams Co.,* 309 Pa. 574, 577, 164 A. 724. It involves a *sudden* occurrence. But the Occupational Disease Compensation Act contemplates as well disease or injury resulting to the employee from the slow and gradual effects of certain named poisons or other deleterious substances in any occupation involving direct contact with them, or exposure to them—among them, poisoning by carbon bisulphide, or the same thing, carbon disulphide (sec. 2(c)); see 147 Pa. Superior Ct. 372, p. 377, 24 A. 2d 698, p. 701. In fact, certain provisions

of the Act contemplate an exposure of five or more years before the injurious effects to the employee develop to the point of disablement or death due to such occupational diseases, (sec. 7), in which event the compensation awarded is to be payable jointly by the Commonwealth and the employer, in certain prescribed proportions. Hence those decisions under the Workmen's Compensation Act which are based on the sudden or accidental nature of the injury resulting in the employee's disability or death have no application to the statute now under consideration.

Furthermore, the Act expressly provided in (sec. 6), "(a) If it shall be shown that the employe, at or immediately before the date of disability, was employed in any process or employment set forth in section two [which includes exposure to carbon disulphide], it shall be *presumed that the occupational disease is due to the nature of that employment.* This presumption, however, shall not be conclusive." [1]

"(b) An employer shall be liable for the payments prescribed by this act for the occupational diseases described in section 2 hereof when disability of an employe resulting in loss of earnings, shall be due to an employment in a hazardous occupation in which he was employed and such disability results within two years after the last exposure in such employment, or in case of death resulting from such exposure, if such death occurs within five years following disability from such disease." (Italics supplied).

The evidence clearly established that the claimant's

---

[1] Practically the same provision is contained in the Pennsylvania Occupational Disease Compensation Act of June 21, 1939, P. L. 566, 77 PS §1401f, in section 301(f) as follows: "If it be shown that the employe, at or immediately before the date of disability, was employed in any occupation or industry in which the occupational disease is a hazard, it shall be presumed that the employe's occupational disease arose out of and in the course of his employment, but this presumption shall not be conclusive."

husband, Thompson Plaugher, was employed by the defendant as a spinner for seven years;[2] that during all that time the defendant in its process of manufacturing rayon used, and still uses, carbon disulphide, which is a deadly poison; that claimant's husband worked, exposed to the fumes of carbon disulphide, until February 2, 1938 when he became totally disabled, and that he died on February 19, 1939, without having gone back to work.

The present claim for compensation was heard as a companion case to six others, three of which were heard by Referee Alessandroni, who considered this case, and three others by Referee Patterson in Lewistown, against the same employer for disability and death resulting from carbon disulphide poisoning, some of which were determined by the board in favor of the claimants and some in favor of the defendant. Testimony taken in the companion case of *James R. Nichols v. American Viscose Company* was by stipulation (p. 153a) incorporated into the record of this case.

The testimony so incorporated into the record in this case includes the following testimony by Dr. Max Trumper, a bio-chemist and toxicologist, author of a book on *Toxicology* and a book on *Biochemistry in Internal Medicine,* who was familiar with the process of making viscose, which he described as follows:

"The viscose process is the method of converting short cellulose fibers or cotton lint and wood into a continuous filament which is known as rayon."

He further testified that carbon disulphide is used in the process and is the chemical which converts the alkalized cellulose or crumbs into the viscose material, and that: "Carbon disulphide is one of the most dangerous chemicals, that is both from the standpoint of

---

[2] From August 2, 1923 to December 23, 1925, and from June 12, 1933 to February 2, 1938, inclusive.

poisonous qualities and also from the standpoint of its explosive qualities, that is used in the industry"; and that carbon disulphide vaporizes into a gaseous state at room temperature, and that as soon as carbon disulphide in liquid form strikes the air, it becomes a gas.

He inspected the Marcus Hook plant of the defendant—where Plaugher had worked—with Dr. Gordy, who attended the employee and was a physician called as a witness for the claimant, spending about three hours at such plant.

He did not make a quantitative test to determine the amount of carbon disulphide in any of the rooms because he thought it would be useless to make an isolated determination, and that isolated chemical analyses of the air are misleading and of no practical value. He, however, smelled the presence of carbon disulphide in every room, including the spinning rooms where decedent worked. The quantity of the gases given off varies, depending on the quality of the material that is being made as well as the quantity of the material. He was familiar with the duties of the workmen in the spinning room and said their duties involved a fume exposure, not sufficient to cause poisoning in a few weeks or a month but sufficient to poison a man who has been working in that spinning room for many years.

He testified as to the effect of carbon disulphide fumes on the human body, as follows:

"Yes, it is common knowledge among toxicologists and more recently among an increasing number of other professional men that carbon disulphide can give rise to a variety of symptoms. If we bear in mind it has fundamentally a chemical use in industry, namely that it is an unusually good lipoid [3] solvent and for that reason it has been used in the rubber industry and other industries because of its remarkable solvent properties.

[3] Lipoid—"I. adj. Having the appearance of fat. II. n. The fat of the nerve cells." Century Dictionary, Vol. XI, (New Volume).

Now, the same chemical properties which make it desirable to use in industries is likewise present when it is inhaled and attacks the lipoid or fat-like structures throughout the body, obviously the more delicate fat-like insulations. Sheathes which bathe the nerve structures of our bodies are highly vulnerable whereas the heavy fat-like deposits in the skin and other portions of the body are hardly at all affected at first. Therefore, the toxicologist bears this fundamental property in mind and invariably it will account for the considerable mystery in professional circles as to the toxic nature of this gas and its effect on the human system will depend entirely and at what point the microscopic bombardment of the carbon disulphide solvent has made its effect. In early exposure it is somewhat difficult to be certain of its effects, but in prolonged exposure its effects are invariably on the nerve structures, sometimes in the brain, in the peripheral nerves and sometimes on the fatty layers of the heart and renal system. Then as time goes on you get an actual irritating effect on the lung tissue and it is surprising how frequent these men are erroneous and are thought to be suffering from tuberculosis because of its mildly irritating effects on the lung tissue. The other important fact is that almost 90% of this gas after it has been inhaled is eliminated by the lungs so that we get the effects, *but in order to catch that gas you must analyze the blood and urine of the worker while in the plant at varying levels of exposure.* In other words, if the man's blood and urine are analyzed in the morning when they first begin work you always get negative findings and the same thing applies with respect to all gases that are highly volatile and readily diffused." (Italics supplied).

Claimant's case was also supported by the testimony of Dr. Samuel T. Gordy and Dr. Samuel Bellett, physicians who attended or examined her husband during his disability. The former diagnosed his illness as chronic

disulphide poisoning, associated with rheumatic heart disease, and testified, inter alia, that carbon disulphide poisoning causes disturbance in the cardiac muscle and fatty degeneration of the heart; and that in this case, in his opinion, it aggravated the rheumatic heart disease, of which the patient suffered; "It added a toxic factor on a damaged heart. It added to the damage, and made the heart incapable of recovering from the strain. ...... It aggravated the damage already done to the heart by the rheumatic fever." Dr. Bellett's diagnosis was rheumatic heart disease; but he testified "that in a patient of this type, suffering from a myocardial condition, with a disturbance in his lungs also, the inhalation of fumes, noxious fumes [from carbon disulphide] would be much more injurious than to a normal individual, or to an individual who had no such condition." He gave it as his opinion that the attacks Plaugher suffered while at work could be explained by the carbon disulphide fumes; and he testified definitely that it was his opinion, "That the work he was doing aggravated—that is inhalation of noxious fumes aggravated his condition and certainly was a definite factor in his death." "Q. By a definite factor, you mean what? A. That it aggravated his condition. Q. That it contributed to his death? A. It contributed to his death."

We must note here that unlike disability or death due to silicosis, anthraco-silicosis, or asbestosis, compensation is payable where the occupational disease—due to carbon disulphide et al.—is a contributory or accelerating cause. See *Williams v. Susquehanna Collieries Co.*, 148 Pa. Superior Ct. 540, pp. 541-543, 25 A. 2d 751. The provision excluding contributory or accelerating causes as the basis for compensation for disability or death due to silicosis, anthraco-silicosis and asbestosis (See *Stauffer v. Hubley Mfg. Co.*, 151 Pa. Superior Ct. 322, 30 A. 2d 370, does not apply to carbon disulphide

and the other diseases catalogued in section 2, paragraphs (a) to (j) inclusive.

It is not necessary for us to go into further details of the testimony, or cite additional expert authority as to the injurious effects on the health of *some* persons caused by the inhalation of carbon disulphide gas. They are set forth at greater length in the opinion of the learned court below. Three things are important to be remembered: (1) The extremely volatile character of carbon disulphide, so that in a short time after leaving the place where the fumes were inhaled, the *gas* is not discoverable in the body, although its injurious effects remain. (2) That it attacks the delicate fat-like structures which sheathe and insulate the nerve structures, including those of the heart, and is more injurious to one who has a diseased heart condition than to a person who has no such condition. (3) That the effects on the system of such a person are an aggravation and acceleration of such a condition, not readily discoverable by specific indications or appearances differing from those attending the heart condition; but that long-time exposure to it has injurious effects on the brain and central nervous system, the digestive system, the heart, and the generative system—all of which were present when Plaugher was examined, after he became disabled on February 2, 1938.

In our opinion, the evidence in the record—taking into consideration the testimony in the companion Nichols case—supports the findings of the referee, approved by the board, the most important of which are as follows:

"7. That on February 2, 1938, decedent was stricken by illness and was rendered unfit to engage in any gainful occupation.

"8. That the cause of decedent's illness and resultant total disability on February 2, 1938, was 'rheumatic

heart disease' aggravated by carbon disulphide poisoning ......

"10. That the occupation in which the decedent was engaged on and prior to February 2, 1938, involved daily contact with and exposure to carbon disulphide fumes.

"11. That carbon disulphide is a chemical, utilized by the defendant company in its plant at Marcus Hook, Penna., in the manufacture of rayon by the viscose process; that carbon disulphide is a poisonous liquid which vaporizes into a gaseous state at churn and spinning room temperature; that carbon disulphide is a severe neuro poison, toxic[4] in nature; that in cases of prolonged exposure it has a degenerating effect on the nerve structures, the brain, the peripheral nerves and the fatty layers of the heart as well as the renal system. It has an irritating effect on the lung tissues.

"12. That in this case the occupational disease developed to the point of disablement only over a period of more than five years.

"13. That the total disability of the decedent continued from February 2, 1938, to the time of his death.

"14. That the decedent died on February 19, 1939, of rheumatic heart disease and mitral stenosis.

"15. That death was accelerated by carbon disulphide poisoning."

In our opinion these findings are based on *competent, substantial and sufficient* evidence—which, as we said in *Tomshuck v. Wallin Corp.,* 146 Pa. Superior Ct. 390, 394, 23 A. 2d 74: "means nothing more than that there must be competent evidence in the record, adequate or sufficient to support or justify the *finding*. The question is, whether the findings of the board are supported by competent evidence sufficient to require their submission to a jury, if the proceeding were an action at law. We hold they are."

---

[4] "Toxic. Of, pertaining to or caused by poison" (Webster). "Of the nature of a poison; poisonous" (Oxford Shorter).

As the findings are based on competent, substantial and sufficient testimony, and they sustain the conclusions of law which support the award, on which the judgment appealed from rests, we overrule the assignments of error and affirm the judgment.

Judgment affirmed.