## WATKINS v. NATIONAL ELECTRIC PRODUCTS CORPORATION.

### No. 9383.

Circuit Court of Appeals, Third Circuit.

Argued Dec. 18, 1947.

Decided Jan. 30, 1948.

Louis Vaira, of Pittsburgh, Pa. (Eugene A. Caputo, of Ambridge, Pa., on the brief), for appellant.

V. C. Short, of Pittsburgh, Pa., for appellee.

Before BIGGS, GOODRICH and O'CONNELL, Circuit Judges.

GOODRICH, Circuit Judge.

The plaintiff sued the defendant in the District Court for injuries sustained by alleged negligence of the defendant by not providing a safe place for him to work in that it failed to remove noxious fumes or provide personal protective devices. Such failure is a violation of the Pennsylvania Factory Act of 1937.[1] Jurisdiction of the Federal Court is based on diversity of citizenship and the entire question is one of Pennsylvania law. It is our humble function to determine, as best we can, what a Pennsylvania court would say under similar circumstances.

At the trial the District Judge, upon defendant's motion, entered judgment for the defendant after the jury had disagreed. The one point upon which the District Judge decided the case and the one point brought to us, is whether the plaintiff's rights, whatever they may be, are to be exclusively measured by the Pennsylvania Occupational Diseases Act.[2]

The parties here have accepted the Act and are bound by its provision making the Act the exclusive means for deciding the existence and extent of the liability in situations where it applies.[3] At this stage of the case we, of course, take the plaintiff's testimony at its face value and ask ourselves whether, if applied most favorably to him, he has shown a basis for common law recovery.

Plaintiff is now suffering from tuberculosis. The tuberculosis followed a period in which he worked in defendant's factory. Part of the time during which he worked there he was engaged in a step in the process of insulating copper wire. One of the means used to insulate this wire was a preparation called "halowax". The evidence shows that "halowax" contained "halogenated hydrocarbon".[4] The "halowax" was applied to the wire in a liquid condition. Liquefaction was brought about by heating solidified wax to the melting point. Plaintiff says that escaping fumes from these pots of "halowax" entered into his nose, throat, and lungs and that this lighted up a quiescent tubercular condition.

Poisoning by chlorinated hydrocarbons is expressly included as one of the injuries for which recovery is given under the Pennsylvania Occupational Diseases Act.[5] If the plaintiff's evidence shows he was poisoned by such substance, his own proof has taken him out of common law recovery and indicated a claim under the statute. Under such claim, a recovery cannot be had in a law court, but must go through the compensation procedure provided for by the Pennsylvania legislature. Fritsch v. Pennsylvania Golf Club, 1947, 355 Pa. 384, 50 A.2d 207; Moffett v. Harbison-Walker Refractories Co., 1940, 339 Pa. 112, 14 A.2d 111.

Two of the plaintiff's expert witnesses gave as their opinion that the noxious fumes which the plaintiff breathed lighted up a theretofore quiescent case of tuberculosis. Another physician, however, while agreeing that what had happpened was the "lighting up of the quiet tuberculosis condition of the patient" indicated that such activation of a tuberculosis case would not constitute a "poisoning" of the system. There was, in

---

[1] P.L. 654, § 2 (1937), 43 P.S. § 25—2 (e).

[2] P.L. 566, § 101 et seq., 77 P.S. § 1201 et seq.

[3] "Such agreement [to accept provisions of article 3 of act] shall constitute an acceptance of all the provisions of * * * [the Occupational Diseases Act] and shall operate as a surrender by the parties thereto of their rights to any form or amount of compensation or damages for any disability * * * resulting from occupational disease * * * other than as provided in article three of this act." P.L. 566, § 303 (1939), 77 P.S. § 1403.

[4] The halogen in the "halowax" was chlorine.

[5] "The term 'occupational disease,' as used in this act, shall mean only the following diseases:

* * *

(c) Poisoning by * * * carbon bi-sulphide * * * or halogenated hydro carbons, or any preparations containing these chemicals or any of them * * *." P.L. 566, § 108 (1939), 77 P.S. § 1208.

the medical testimony, evidence to the effect that the breathing in of chlorinated hydrocarbon could produce dermatitis and acute yellow atrophy of the liver. This plaintiff did not suffer either of these effects.

The question in this case becomes, therefore, whether plaintiff has taken his case out of the Occupational Diseases Act by the testimony of one of his expert witnesses that lighting up of a theretofore quiescent tuberculosis was not "poisoning". This states the physician's testimony perhaps stronger than the physician would have put it. The doctor said: "Poison would indicate direct poison in the system, systemic poison." The examination did not proceed to find out from the doctor whether "systemic" poison was the only kind of poison there is. A reference to medical books, however, indicates that such term is used to distinguish a poison which exerts its effect after absorption from an irritant poison. Cattell, New Medical Dictionary (1910) p. 969; Reese, Medical Jurisprudence & Toxicology (6th Ed. 1902) p. 385. The facts in this case indicate clearly that whatever happened was caused by irritation to the tissues rather than absorption of poison into the system.[6]

■ We think the meaning of the term "poison" or "poisoning" in a statute is not a question to be decided by a jury in the light of expert testimony, but one for a court. It is for the court to ascribe the effective meaning to words used by the legislature. Of course, the term, as used by experts,[7] is also relevant in considering the answer to be given. But it is by no means conclusive and the question is certainly not to be turned over to a jury to decide for itself in each case.

■ We have no doubt that "poison" as used in common parlance is not limited to "systemic poison" which the doctor was speaking of in this case. The District Court found a wider definition in Corpus Juris which it applied. It runs as follows: "Poison may be defined as any substance which, where introduced into the system either directly or by absorption produces violent, morbid, or fatal changes, or which destroys living tissue with which it comes in contact." Watkins v. National Electric Products Co., D.C., W.D.Pa., 1947, 69 F. Supp. 596, 598. Turning to the dictionary, we find a not dissimilar statement: "Poison * * * Any agent which, introduced * * * into an organism, may chemically produce an injurious or deadly effect * * * ."[8] When we turn to judicial use for the word we find the same broad meaning carried through which emphasizes the introduction of the poisonous substance into the body and the resulting harm, without any attempt to make the distinction that plaintiff here urged. State v. Baldwin, 1886, 36 Kan. 1, 12 P. 318; Urian v. Scranton Life Insurance Co., 1933, 310 Pa. 144, 165 A. 21; United Fidelity Life Ins. Co. v. Roach, Tex.Civ.App. 1933, 63 S.W.2d 723.

■ Finally, and we think this clinches the point, it is to be remembered that this is a case turning on a Pennsylvania statute and that statute has had interpretation by the Pennsylvania courts. The courts in Pennsylvania have held that the effect of the inhalation of carbon disulphide upon the heart is within the phrase "poisoning by carbon bisulphide".[9] Carbon bisulphide is listed in the same part of the Occupational Diseases Act as halogenated hydrocarbons. The court there relied upon the testimony

---

[6] Poison action is either local or remote. Remote, or systemic, poison produces its effect by being absorbed into the circulation and then acting on organs more or less remote from the point of their absorption. The other type of poison menaces life by destroying the tissue it comes into contact with. Glaister, Medical Jurisprudence and Toxicology (5th Ed.1931) p. 671; 2 Wharton and Stille's Medical Jurisprudence (5th Ed.1905) p. 34. Chlorine is recognized as being an irritant poison and affecting the pulmonary tissues with which it comes into direct contact. Goodman & Gilman, The Pharmacological Basis of Therapeutics

(1941) p. 711; Glaister, Medical Jurisprudence and Toxicology (5th Ed.1931) p. 791.

[7] In this connection it is interesting to note that Goodman and Gilman in their treatise on Pharmacology and Toxicology discuss the irritant effect of chlorine, the halogen here involved, on the pulmonary tissue, under the heading "Chlorine Poisoning". Goodman & Gilman, The Pharmacological Basis of Therapeutics (1941) p. 711.

[8] Webster's New International Dictionary (2d Ed.1941) p. 1905.

[9] The court earlier had held that the phrase "poisoning by carbon bisulphide"

which established the fact that the plaintiff's heart condition was aggravated by the toxic gas. Plaugher v. American Viscose Corp., 1943, 151 Pa.Super. 401, 30 A.2d 376. We agree with the trial judge's statement that this case "decisively brings under the Occupational Disease[s] Act cases in which exposure to halogenated hydrocarbon has been a contributory or accelerating cause aggravating or accelerating a pre-existing disease." Watkins v. National Electric Products Co., D.C., W.D.Pa., 1947, 69 F.Supp. 596, 598.

This being so, the plaintiff's sole remedy is before the Workmen's Compensation Board.

The judgment of the District Court will be affirmed.

included poisoning by carbon disulphide. Plaugher v. American Viscose Corp., 1942, 147 Pa.Super. 372, 377, 24 A.2d 698, 701.