ELLEN O'CONNOR, Respondent, v. THE COLUMBIAN NATIONAL LIFE INSURANCE COMPANY, a corporation, Appellant.

St. Louis Court of Appeals. Opinion Filed June 7, 1921.

1. **APPELLATE PRACTICE: Evidence Not Objected to: Questions on Cross-Examination: Cannot Complain on Appeal.** In an action

to recover on an accident insurance policy for insured's death claimed to have been caused from ptomaine poisoning, where defendant's counsel asked a medical witness on cross-examination if he were certain as to what caused the death of deceased, and made no proper objections to such questions asked by counsel for plaintiff, he cannot be heard to complain on appeal because the physicians were permitted to state what caused deceased's death, as invading the province of the jury.

2. EVIDENCE: Witnesses: May Give Evidence of General Appearance of Deceased Prior to Injury. Neither was there reversible error in permitting witnesses to give evidence as to the general appearance of deceased prior to the attack from which he died.

3. INSURANCE: Accident Insurance: Death by Ptomaine Poisoning: Liability. In an action to recover on an accident insurance policy on the ground that insured died as a result of ptomaine poisoning and the evidence upon the question at issue was conflicting, and the finding of the jury was that deceased came to his death from ptomaine poisoning, and there being substantial testimony to support this finding, the appellate court will not disturb the verdict of the jury.

4. ——: ——: ——: Accidental Poisoning Within Meaning of Policy. Where an accident insurance policy provided for payment to the beneficiary if the deceased died of "injuries effected directly and independently of all other causes, through accidental means," etc., death by ptomaine poisoning created a liability under the terms of the policy, and it would make no difference whether the ptomaine poisoning was in the ice-cream which deceased ate, or in the meat, peas, or other substance; if he took it into his stomach with any of the food products mentioned in the evidence and as a result died therefrom, it would be accidental poisoning, and the insurer would be liable.

Appeal from the Circuit Court of the City of St. Louis.— *Hon. Karl Kimmel,* Judge.

AFFIRMED.

*Leahy & Saunders* and *David W. Voyles* for appellant.

(1) A lay witness will not be permitted to attempt a diagnosis of disease. Atkinson v. American School of

Osteopathy, 199 Mo. App. 251, 270. (2) It is not competent to call upon witnesses to determine that which it is for the jury to decide. Spaulding v. City of Edina, 122 Mo. App. 65, 69; Merkel v. Ry. Mail Assn., 226 S. W. 301; Deiner v. Sutermeister, 266 Mo. 505; State v. Hyde, 234 Mo. 200; Glasgow v. Railway, 191 Mo. 347; Baehr v. Union Casualty & Surety Co., 133 Mo. App. 544. (3) Inferences drawn by physicians, as experts, from facts not in evidence should be excluded, and wholly disregarded. State v. Hyde, 234 Mo. 200; Atkinson v. American School of Osteopathy, 199 Mo. App. 251; Bush v. Lisle, 89 Ky. 393. (4) No issue should be submitted to the jury which the jury can only determine by speculation or an injecture. Bœckmann v. Valier & Spies Milling Co., 199 S. W. 457, 460. (5) Where there is no direct evidence that the insured sustained an external or accidental injury, the issue, as to whether he did or not, cannot be founded upon inference only; nor where there is such lack of evidence can an inference that the death resulted from accidental means be based upon an inference of accidental injury. Merkel v. Ry. Mail Assn., 226 S. W. 300; Wright v. United Commercial Travelers, 188 Mo. App. 457; Rathman v. New Amsterdam Casualty Co., 186 Mich. 115; National Assn. Ry. Postal Clerks v. Scott, 155 Fed. 92; Carr v. Pacific Mut. L. Ins. Co., 100 Mo. App. 602.

*O'Neill Ryan* for respondent.

(1) No lay witness here attempted to diagnose the ailment of the deceased. But even a layman, a non-expert, may state the apparent physical and nervous condition of a person and his appearance of pain, of activity and generally his manner and habits. Lindsay v. Kansas City, 195 Mo. 166; Osborne v. Wells, 211 S. W. 887; Schwanenfeldt v. Street Railway Co., 187 Mo. App. 594; Elliott v. Railway Co., 157 Mo. App. 521-522; Winkler v. Terminal Assn., 227 S. W. 627. (2) The burden was on appellant to sustain its only affirmative

defense, to-wit: That the death of O'Connor resulted from disease. Laessig v. Traveler's Association, 169 Mo. 280; Beile v. Protective Assn., 155 Mo. App. 642. (3) If there were any merit—as there is not—in appellant's two points about the argument to the jury made by respondent's counsel, the appellant did not save either point below by an execption. Torreyson v. United Railways, 164 Mo. App. 375; State v. Thurman, 121 Mo. App. 377. There must be an exception saved to the adverse ruling, at the time the ruling is made, on an objection to counsel's argument, and also a reservation of the point in the motion for new trial. Both are necessary. Eppstein v. Missouri Pacific Railway Co., 197 Mo. 728. (4) (a) The witnesses here were not called upon "to determine that which it was for the jury to decide" as contended in appellant's brief, (b) There were no inferences drawn by respondent's expert (Dr. Simon) from facts not in evidence, as indicated in appellant's brief, page 31. (5) "Accidental means" in an accident policy (and those were the words used in this policy) "are those means which produce effects that are not the natural and probable consequences of the act." See: Beile v. Protective Assn., 155 Mo. App. 642; Wright v. Order, etc., of America, 188 Mo. App. 462. General definitions of the word accident are found in Lovelace v. Travelers Co., 126 Mo. 111. (6) The taking in of the ptomaine poison by O'Connor was clearly an accident. That is to say the "accidental means" of his death. United States Casualty Co. v. Griffis, 186 Ind. 126; Johnson v. Fidelity and Casualty Co., 184 Mich. 406 (L. R. A. 1916, A. 475). Other cases holding that the ingestion or absorption of poison is within the protection of an accident policy are: Dezell v. Fidelity and Casualty Co., 176 Mo. 253; Beile v. Protective Assn., 155 Mo. App. 629; Columbia, etc., Co. v. Fidelity & Casualty Co., 104 Mo. App. 157; Travelers Co. v. Dunlap, 160 Ill. 642; Healey v. Mutual, etc., Assn., 133 Ill. 556; Mutual Acc. Assn. v. Tuggle, 39 Ill. App. 509; Ingersoll v. Knights, etc., 47 Fed. 272; Hodgson v.

208 M. A.—4

Pref. Acc. Assn., 165 N. Y. Sup. 293. (7) The evidence showed there is a definite and deadly poison known as ptomaine. There was ample evidence to warrant the conclusion reached by the jury that O'Connor's death was directly due to the accidental swallowing of ptomaine poison. All the symptoms pointed unerringly to that as the direct cause of his death. (a) It would have been a question for the jury had there been (as I say there was not) evidence that the death was due to another cause, or to other causes. Campbell v. Aetna Ins. Co., 222 S. W. R. 780; Dezell v. Fidelity Casualty Co., 176 Mo. 253; Merkel v. Railway Mail Association Assn., 226 S. W. 299; Greenlee v. Casualty Co., 192 Mo. App. 303; Fetter v. Fidelity and Casualty Co., 154 Mo. 256; Younge v. Railroad, 133 Mo. App. 141. (b) If there are several causes that may have brought about the result (death), direct evidence of one is not necessary. It is enough to show with reasonable certainty that the one claimed by plaintiff was the cause—cases supra, and Merrick v. Travelers Ins. Co., 189 S. W. 392; Kelly v. Railroad, 70 Mo. 604. (c) If the accident causes disease and the latter causes death then the accident is the proximate cause. Carr v. Ins. Co., 100 Mo. App. 602; Freeman v. Merc. Mut. Acc. Co. Assn., 156 Mass. 351; Railway v. Wood, 66 Kan. 613; Railway v. McDade, 112 Fed. 888; Continental Co. v. Lloyd, 73 N. E. 824; Dulaney v. Modern Acc. Co., 97 N. W. 91. (8) Direct evidence that O'Connor swallowed ptomaine, e. g., that he took down and drank of a bottle labeled and containing poison, was not necessary. Reasonable probabilities or inferences may be drawn by the jury from all the facts and circumstances in evidence. Lœssig v. Travelers Ins. Co., 169 Mo. 272; Merkel v. Railway Mail Assn., 226 S. W. 300; Merrick v. Travelers Ins. Co., 189 S. W. 392. However, as it was said in the Merrick case: Our "evidence deals with every possible cause of diseases manifested by the symptoms of the one in question and definitely excludes from the sphere of reasonable inference all other causes than

that alleged." And see Winkle v. Dry Goods Co., 132 Mo. App. 566, where both court and jury inferred the fact that established negligence, direct proof not being obtainable.

NIPPER, C.—This is a suit to recover on an accident insurance policy. Plaintiff recovered and defendant appeals.

The petition is in the usual form. The answer, after a general denial, alleges that deceased came to his death as a result of disease, namely uræmia secondary to acute nephritis.

The deceased, Charles F. O'Connor, died August 28, 1916, and was twenty-three years of age. A sister was named as beneficiary in the policy, which was afterwards assigned to deceased's mother, Ellen O'Connor. Charles F. O'Connor was single, and lived with his parents in St. Louis. His general health had been good up to the time of his death, with the exception of being operated upon for appendicitis in March, 1916, but he was able to go about his work in the office of the Meyer Milling Company, where he was employed on April 12th following the date of the operation. He was also sick during the month of August prior to his death, with an attack of what was termed in the evidence as "Summer Grippe." He had gone back to work on August 21, 1916. On the evening of August 24th, or in the early morning of August 25th, he was taken seriously ill, and died four days later.

His mother stated that on the evening he was taken ill, he ate dinner at their home with other members of the family; that the meal consisted of vegetable soup, crackers, beefsteak, creamed potatoes, canned green peas, a salad of tomatoes and lettuce, graham biscuits, and some coffee. He left home about ten minutes to eight that evening, and started to the Knights of Columbus Building to meet his friend, a Mr. Hannan. Some time near the hour of midnight she was aroused by the screams of the deceased, who was rigid and sitting up-

right in his bed. He was in a convulsion, and perspiration was pouring off his face and hands. He was foaming at the mouth. This convulsion lasted seven or eight minutes. His mother gave him some hot water and baking soda, which produced vomiting.

Dr. Lonsway was called and arrived about half past twelve. When the doctor arrived deceased was neither vomiting nor in convulsions, but was complaining of pains in the upper part of the abdomen. The doctor remained about three quarters of an hour, and about twenty minutes after he left, deceased had another convulsion. Dr. Lonsway came again and stayed about two hours. During the second visit the deceased was conscious, and would speak when he was spoken to. About seven o'clock the next morning Dr. Munsch arrived. About ten o'clock he was taken to the hospital, where he remained until his death.

It was shown by the deposition of Peter W. Hannan, who was twenty-eight years of age, and stationed at Jefferson Barracks at the time the deposition was taken, that he had known the deceased about a year and a half prior to his death, and attended night school with him at St. Louis University; that he saw the deceased during the summer of 1916 on an average of two nights a week. They very frequently spent their evenings together. When asked to describe in general or specific terms his appearance. he said, "I would pick him out as a pretty healthy, good-looking, young man." This answer was objected to as being a conclusion. The objection was overruled, and defendant's counsel excepted. Witness stated that he frequently played handball and went in swimming with deceased; that on the evening of Thursday, August 24, 1916, he and O'Connor were together. They went to a show, and afterwards went to an ice cream parlor at about 10:45 and ate some ice cream; that deceased stated to him at the time they were eating the ice cream that he did not think it was good—that it did not taste good. They left the ice cream parlor soon afterwards, and separated.

It appears from the testimony of defendant's witnesses who conducted the ice cream establishment where the deceased ate on the evening he was taken ill, that the ice cream was made in the usual way, and that there was no complaint from any one else who ate ice cream at this place on that evening.

Dr. Munsch testified that he had practiced medicine in St. Louis for ten years; that he knew deceased as a physician and as a friend, and had at times treated him for minor ailments. He testified that at the time he visited O'Connor's home on the first visit mentioned heretofore, he found that the deceased answered intelligently when spoken to, but did not volunteer information; he was not inclined to move, and resisted handling. He stated he was guided in his treatment by the information given him by the patient, whom he described at that time as being nauseated, pulse eighty to eighty-four, nothing abnormal in respiration nor as to heart, and his temperature about ninety-eight. The skin of his face was pinched, and his extremities showed cyanosis; tongue dry, no odor to his breath; no abnormal odor of any kind coming from his body. He said that he concluded at the time that he had taken in ptomaine, producing the poisoning from which he was suffering. Witness went with the deceased to St. John's Hospital, and treated him there up to the time of his death. He called in consultation Drs. Engelbach and Tierney to assist him. He further described in detail how he treated him, and his condition at various times prior to his death. On cross-examination, when asked the question, "What is ptomaine poisoning?" he answered, "Ptomaine poisoning is a condition brought about by the taking in, with food, of a substance produced by the decomposition in the food before it is taken into the body." Defendant's counsel, on cross-examination, asked him if he was certain as to what caused the death of Charles F. O'Connor, to which he answered, "Well, it is certain as a person could be."

Dr. Lonsway also testified as to the condition in which he found the deceased on his visits to him the night

he was taken ill. He stated that he was a friend of the deceased, and knew him well; that they were frequently together. This doctor was permitted to state, over the objections and exceptions of defendant's counsel, that from the general appearance of deceased during the time he knew him, he took him to be in good physical condition; that he formed the opinion at that time that deceased had taken in ptomaine poison, and upon that basis he treated him. He gave further evidence in detail as to deceased's condition at that time. On cross-examination he said that ptomaine poisoning, as he understood it, is usually produced by the action of bacteria upon protein, and by taking the food into the system the bacteria produced the toxic condition in the system known as ptomaine poisoning.

Dr. John H. Simon, who had been active in the general practice of medicine in St. Louis for about twenty-six years prior to the date of deceased's death, testified that he was in court and heard the testimony of Dr. Lonsway read; also the testimony of Dr. Munsch and of Mrs. O'Connor. He stated that during the course of twenty-eight years of practice he had possibly seen three hundred cases of ptomaine poisoning, and that he had also seen perhaps one thousand cases of acute nephritis and uræmia. He says there is such a thing as ptomaine poison; that ptomaine is a word which has been applied to a group of poisonous and some non-poisonous substances which are the product of bacterial action; that there is such a poison "whether you call it ptomaine or toxic food poison." In giving his opinion as to the cause of the death of deceased, he stated that he believed he came to his death by the accidental taking into his stomach of ptomaine poison, on the night of the 24th of August, 1916. In distinguishing between a case of ptomaine poisoning and uræmic poisoning, he went into the matter in detail, showing a vast and marked difference in the two cases. And from his testimony it appears with reasonable certainty that death was due to ptomaine poisoning.

At the close of plaintiff's case, defendant offered an instruction in the nature of a demurrer, which the court refused to give.

Dr. Taussig, testifying on the part of the defendant, stated that he had made a specialty of internal medicine, and some years ago, of food poisons. He says that from the testimony given by the attending physicians, a proper diagnosis could not be made. When asked as to what was ptomaine poisoning, he said:

"Ptomaine poisoning is a convenient term that is still retained by men who are not careful about their language, about the words they use, to cover what is now better known as food poisoning."

That from the symptoms he had heard described the deceased may have had pneumonia, Bright's disease and uræmia, or intestinal obstruction; that he might have died from the multiplication in his system of virulent bacteria taken in with food; that he had never seen or heard of a disease that could be definitely established as due to ptomaine; that he had heard or read of people becoming ill or dying from ptomaine poisoning, "but not as the result of recent work, or work by men whom I considered knew what they were talking about;" that if this poison as it ordinarily exists, was in the food which one ate, of sufficient quantity to produce death, it would be so obnoxious and taste so bad that no one would eat it; that when an individual is made sick, and especially serious sick, that illness is not due to the ptomaines but to other products of bacterial action.

Dr. Ives, another witness testifying for defendant, who said he had made a specialty of bacteriolgy and pathology, said that he never knew of any case where death had resulted to a human being from ptomaine poisoning.

It is unnecessary at this time to refer to other evidence.

Defendant contends that its peremptory instruction should have been given, because the physicians were permitted to state what caused deceased's death, as this

was invading the province of the jury. We do not find such testimony in the record where the doctors were asked or permitted to state in positive terms what caused deceased's death, except where defendant's counsel asked Dr. Munsch, on cross-examination, if he was certain as to what caused the death of Charles F. O'Connor. If defendant's counsel asks questions of this character, or makes no proper objections to those asked by counsel for plaintiff, he cannot be heard to complain in this court on appeal; neither is there reversible error in witnesses giving evidence as to the general appearance of deceased prior to the attack from which he died. [Lindsay v. Kansas City, 195 Mo. 166, 93 S. W. 273; Schwanenfeldt v. Street Railway Co., 187 Mo. App. 588, 174 S. W. 143; Winkler v. Terminal Railroad Association (Mo. App.), 227 S. W. 625.] Nor can we uphold defendant's contention that there is no substantial evidence to show that deceased died from ptomaine poisoning. The learned counsel for defendant insists that deceased came to his death from food poisoning, or in some other way than from ptomaine poisoning, contending that the evidence of Drs. Taussig and Ives shows that it would be impossible for deceased to have taken sufficient ptomaines into his system to have caused death, under the circumstances detailed in evidence, and in their brief say:

"Here, as in other cases, the law should keep pace with the advances made in other fields of learning."

Under the facts disclosed by the record in this case, we do not think we would be justified in making the advanced strides in such rapid manner as learned counsel suggests. Three doctors testified that there is such a thing as ptomaine poisoning, and that in their opinion this caused the death of Charles F. O'Connor. Two doctors testified that under the facts disclosed at the trial this would be almost impossible. This made a disputed question of fact, which the jury was called upon to decide, and we are not prepared to say that this is a backward step in the administration of justice. Where

eminent doctors disagree, as they did in this case, upon the question at issue, then the jury must decide that issue, which it did, and found evidently that deceased came to his death from ptomaine poisoning; and there being substantial testimony to support this finding, this court will content itself by refusing to disturb the verdict of the jury, rather than to declare as a matter of law that deceased could not have died from ptomaine poisoning, and thereby settle judicially this disagreement between members of the medical fraternity.

This policy provided for payment of the sum mentioned, to the beneficiary, if the deceased died of "injuries effected directly and independently of all other causes, through accidental means," etc.

It has been held that death by ptomaine poisoning created liability under the terms of similar policies, and that the taking of ptomaine poison, under such circumstances as here, was an accident within the meaning of such a policy. [Johnson v. Fidelity & Casualty Co., 184 Mich. 406; United States Casualty Co. v. Griffis, 186 Ind. 126.]

It would make no difference whether the ptomaine poison was in the ice cream which deceased ate, or in the meat, peas, or other substance; if he took it into his stomach with any of the food products mentioned in the evidence, and as a result died therefrom, it would be accidental poisoning and the defendant would be liable.

In addition to the cases above cited, we refer to the following: Dezell v. Fidelity & Casualty Co., 176 Mo. 253, 75 S. W. 1102; Beile v. Protective Association, 155 Mo. App. 629, 135 S. W. 497; Paul v. Travelers Insurance Co., 112 N. Y. 472; Freeman v. Mercantile Mutual Accident Association, 156 Mass. 351; Travelers Insurance Co. v. Dunlap, 160 Ill. 642; Railway Mail Association v. Dent, 213 Fed. 981.

To so hold does not mean that the verdict of the jury can be sustained only by placing inference upon inference. It was an established fact that deceased was

taken sick, and died, and from the manner in which he was taken sick, and the circumstances attending his last illness, it would appear from the testimony of the physicians, that his death was caused by ptomaine poisoning, and we think this was a fair and reasonable inference based upon established facts. And from the fact that he was attacked in the manner in which he was, and it being shown that he partook of the food substances mentioned in the evidence, we think it a reasonable inference to be drawn from the same facts, that the ptomaine poison was taken into the stomach some time during the afternoon or evening of August 24, 1916. [Merkel. v. Railway Mail Association, (Mo. App.), 226 S. W. 299.]

Other assignments of error we have examined and find them without merit.

The record is free from reversible error, and under the facts of this case it appears that the judgment is a righteous one. The Commissioner recommends that it be affirmed.

PER CURIAM:—The foregoing opinion of NIPPER, C., is adopted as the opinion of the court. The judgment of the circuit court is accordingly affirmed.

*Allen, P. J.,* and *Becker. J.,* concur; *Daues, J.,* not sitting.