## AUBUCHON v. METROPOLITAN LIFE INS. CO.

### No. 12667.

Circuit Court of Appeals, Eighth Circuit.

April 4, 1944.

Rehearing Denied May 16, 1944.

---

Jacob M. Lashly, of St. Louis, Mo. (B. Sherman Landau and Al F. Gerritzen, both of St. Louis, Mo., on the brief), for appellant.

Raymond E. LaDriere, of Clayton, Mo. (Samuel W. Fordyce and Walter R.

Mayne, both of St. Louis, Mo., Harry Cole Bates, of New York City, and Fordyce, White, Mayne, Williams & Hartman, of St. Louis, Mo., on the brief), for appellee.

Before THOMAS and JOHNSEN, Circuit Judges, and MOORE, District Judge.

JOHNSEN, Circuit Judge.

The action is one under Missouri law to recover on the double indemnity provision of a life insurance policy, by which the insurer had agreed to pay the beneficiary an additional sum equal to the face amount of the policy, if the insured's death resulted from "accidental means", excluding, however, death from "self-destruction" and death from "poison * * * voluntarily or involuntarily, accidentally or otherwise, taken, administered, [or] absorbed".[1]

The insurer had paid the beneficiary the regular death benefit under the policy, but denied liability for the extra indemnity on the grounds (1) that the death was not due to accidental means but to suicide while the insured was sane, and (2) that it resulted "from the taking of a poison called barbital or veronal".

The case was tried to the court without a jury, and judgment was entered for the insurer.

The beneficiary's appeal requires consideration of (1) the meaning of the general term "poison" in an insurance exclusion clause, under Missouri law; (2) whether it reasonably appears that the trial court applied this meaning in finding that barbital or veronal "taken in quantity and under the circumstances and with the result shown in evidence was a poison"; and (3) whether, if the court failed to apply this meaning, the judgment still must be

affirmed on the basis of the further finding that "the death of the insured did not result from accidental means." It should be noted that the court did not undertake to make a specific finding on whether the death was or was not one from self-destruction. If there had been a finding that the death was a suicide, the questions suggested above would not be controlling, since a finding to that effect, on the conflicting evidence in the record, would have been conclusive upon us that the beneficiary was not in any event entitled to recover.

It appears from the evidence that the insured had a chronic circulatory ailment in one of his legs, which at times caused him great pain, and that he on these occasions resorted to the use of barbital or veronal tablets.[2] Such tablets were procurable at any drug store, without medical prescription,[3] in containers of ten or twelve tablets, of five grains each. The effect of the drug in normal doses is sedative and soporific. A normal dose is five grains. The insured commonly took one or two tablets at a time. On one occasion, a few months before his death, he had taken ten tablets, without explanation, and was found by his wife in the basement of their home, in a coma. He was taken to a hospital and was revived. He declared to the hospital authorities that he had not attempted to commit suicide, but had taken the tablets to relieve the terrific pain in his leg. One of his acquaintances, however, testified that the insured afterward told him that he had tried to commit suicide and would do so again when he got the chance—but the witness added that the insured had not impressed him as being serious in his remark.

The insured was a heavy drinker. His hospital chart, which was admitted in evi-

---

[1] The exact language of the double indemnity rider is as follows: "Metropolitan Life Insurance Company * * * hereby agrees to pay to the beneficiary * * * in addition to the [$5000] amount payable according to the terms of said Policy, the sum of 5000 dollars, upon receipt, * * * of due proof of the death of the insured, as the result, directly and independently of all other causes, of bodily injuries sustained solely through external, violent and accidental means, provided * * * (5) that death shall not have occurred as the result of self-destruction while sane or insane, or as the result or by the contribution, directly or indirectly, of disease or of bodily or mental infirmity; * * * and (8) that death shall not have

occurred as a result, directly or indirectly, of any poison, gas, or fumes, voluntarily or involuntarily, accidentally or otherwise, taken, administered, absorbed or inhaled".

[2] One of the expert witnesses testified that "Barbital is the name given barbituric acid in the United States Pharmacopeia"; that veronal is a trade name for the barbiturate of a particular drug manufacturer; and that luminal, amytal, nembutal and seconal also are trade names for the similar product of other manufacturers.

[3] The evidence shows that at the time here involved no medical prescription was necessary to make purchases of barbital or veronal.

dence without objection, showed that his wife had stated that for several years he had averaged "1-3 quarts" of whiskey a day. It also showed that she had said that they had been having marital difficulties, and that he had threatened to kill her and himself if she undertook to get a divorce. On the trial, the wife denied that the insured had made any such threats or that she had made any such statement. After the insured had recovered from the effects of the ten veronal tablets, his wife apparently separated from him and instituted proceedings for divorce. She took a decree in these proceedings immediately following the veronal-taking incident here involved, and, indeed, on the very day that he died. The insured had substituted the present beneficiary in the policy for his wife less than a month before this time.

The insured had on a number of occasions entered the Veterans Hospital at Jefferson Barracks, Missouri, to obtain treatment for his leg. On the last of these occasions, he was released from the hospital on October 24, 1940. He took a room at a St. Louis hotel and apparently resumed his old habits. On October 29, 1940, about noon, he telephoned the beneficiary of the policy, complaining of the severe pain in his leg and asking her to get her husband to take him out to the Veterans Hospital. The husband could not be located, and the insured then telephoned another acquaintance to come to the hotel. According to the latter's testimony, "he told me he was in pain and asked me if I would get him some medicine." The acquaintance got him two tubes of veronal and a bottle of empirin compound at a nearby drug store, as the insured had requested. The insured emptied the two tubes of veronal, consisting of some twenty or twenty-four tablets, into his hand, together with some of the empirin, and "started out to take them", but "spilled quite a few of them." When the acquaintance suggested that that many tablets might "hurt" him, the insured replied that "he took as many as that before and didn't bother him." When the hotel authorities insisted that he go to a hospital, the insured asked to be taken to the Veterans Hospital, where he died three days later, the cause of his death being recorded as acute drug intoxication. A number of witnesses testified that the insured had always had a cheerful disposition and had never manifested any morbid or suicidal tendencies.

Was the insured's death one from poison, under Missouri law?

■ Missouri follows the general rule that, in construing an insurance policy, "the words of the contract must be interpreted in the way in which they [are] ordinarily understood" (Dolph v. Maryland Casualty Co., 303 Mo. 534, 261 S.W. 330, 333), that is, "in their plain, ordinary, and popular sense, rather than in a technical or scientific sense" (Farmer v. Railway Mail Ass'n, 227 Mo.App. 1082, 57 S.W.2d 744, 745). In Cleaver v. Central States Life Ins. Co., 346 Mo. 548, 142 S.W.2d 474, 477, 129 A.L.R. 1094, the court, after reiterating that "the test of the meaning, of words commonly used, should be their ordinary and popular meaning", quotes the following definition of poison from Webster's New International Dictionary: "A potion containing a noxious or deadly ingredient; also such ingredient."

■ Webster further gives as the common meaning of a poison, "Any agent which, introduced (esp. in small amount) into an organism, may chemically produce an injurious or deadly effect". The Encyclopedia Britannica, 14th Ed., states the popular concept of a poison as follows: "The commonly understood definition of a poison would be a substance which if taken internally in small doses is capable of acting deleteriously on the body or of destroying life." Equitable Life Assur. Soc. v. Hemenover, 100 Colo. 231, 67 P.2d 80, 82, 110 A.L.R. 1270, tersely characterizes a poison, in common concept, as "a substance which, in small doses, will destroy life". In looser language, it probably is fair to describe the general uncritical concept of a poison as a substance which ordinarily has such a harmful or deadly chemical effect upon the body that it ought not to be taken internally without technical familiarity or medical direction. The application of this general public concept may not always be absolute as to a particular substance, however, for conceivably there may be substances as to which the specific concept may possibly vary somewhat with the conditions.

■ Certain substances, such as arsenic, strychnine and carbolic acid, are perhaps so universally regarded as poisons in the public mind that they may be declared to be poisons generally, as a matter of law. As to other substances, there may not be such public familiarity as to have created

any general concept, and the question perhaps will be one for appraisal wholly on the evidence produced. As to still other substances some general concept may exist but can not be said to be legally clear, or it may perhaps be subject to some variation with the conditions, so that here also whether the substance involved is a poison will constitute a question of fact in the particular case, but with the right to apply to the evidence such common knowledge and experience as may exist with respect to the substance. Thus, the Missouri courts have held, in Cleaver v. Central States Life Ins. Co., 346 Mo. 548, 142 S.W.2d 474, 129 A.L.R. 1094, and Brock v. American Central Life Ins. Co., Mo. App., 44 S.W.2d 200, that whether the insured's death from carbon monoxide was a death from poison was a question for the jury and not a matter for judicial notice or ruling.

In the present case, we believe that whether the insured's death from barbital or veronal was a death from poison was, under Missouri law, properly a question of fact and not of law. It certainly can not be declared as a matter of law that barbital is absolutely recognized as a poison by general public concept. In addition, the record here contains conflicting expert opinion and other circumstances from which different inferences can be drawn. A pharmacist testified that barbital was sold without a poison label and merely with a notice, "Caution, may be habit-forming"; that its effect was sedative and sleep-producing; and that, in the witness' opinion, death from barbital was not a death from poison. There was contrary medical opinion for the insurer that barbital was a poison, because its effects were toxic. The latter witness, however, was of the view that individual susceptibility and the amount of the dose should both be taken into account in determining in any case whether a drug was a poison. The trier of the fact had the right to consider the testimony of the experts in appraising the qualities of the substance, together with the other evidence heretofore related, and from the whole situation and the light of common knowledge and experience to determine whether general public concept and popular understanding would regard the insured's death from barbital here as a death from poison.

The beneficiary has argued that we ought to hold that barbital is not a poison as a matter of law, under Dezell v. Fidelity & Casualty Co., 176 Mo. 253, 75 S.W. 1102, and Equitable Life Assur. Soc. v. Hemenover, 100 Colo. 231, 67 P.2d 80, 110 A.L.R. 1270. The Hemenover case is a Colorado case and is, of course, not binding upon us. The Dezell case [176 Mo. 253, 75 S.W. 1103] was one where the insured died "from the effects of an overdose of morphine, taken upon the prescription of a doctor, to relieve the pain of neuralgia", and where the court said (75 S.W. at page 1106) that "The better reason supports the rule that [poison] exceptions in [insurance] policies do not cover medicine (even though it contain poison) or anything taken or administered in good faith to alleviate physical pain, even though it results in unexpected and unintentional death", and that "The plaintiff was, therefore, entitled to a verdict as a matter of law". See also Renn v. Supreme Lodge Knights of Pythias, 83 Mo.App. 442; Beile v. Travelers' Protective Ass'n, 155 Mo.App. 629, 135 S.W. 497, 501.

It will be noted that the Dezell case involved a substance prescribed by a physician and admittedly taken in good faith and for medicinal purposes. A medicine in this sense, where there has been no indication by the physician of any danger involved, can undoubtedly be said, as a matter of law, not to be regarded by the average man as a poison. But the obiter language, "or anything taken or administered in good faith to alleviate physical pain", can hardly soundly be read as a literal, legal absolution for every self-selected nostrum that an insured may see fit to take. The language itself implies that the good faith of the insured and his purpose in taking the substance necessarily may be subject to question and may properly present an issue of fact. In addition, the substance may be one whose toxic nature is so generally recognized that the average man would not have selected it for self-administration, or at least not in the quantity which the insured employed. Hence it would seem that, even though the insured has acted "in good faith to alleviate physical pain", there may be situations in which his death may nevertheless be found by a jury to constitute a death from poison in popular concept.

Thus in Dixon v. Travelers Protective Ass'n, 234 Mo.App. 127, 113 S.W.2d 1086, where the insured took carbolic acid for medicinal purposes, his death was held to

be one from poison, notwithstanding his good faith and his intended medicinal purpose. It is true that he did not realize that he was drinking carbolic acid instead of sodium bromide, but nevertheless, whatever he took, he was taking in good faith, for medicinal and no other purpose. He would thus appear to have been within the literal language of the Dezell dictum, if it is entitled to the application for which plaintiff here contends. But the St. Louis Court of Appeals did not regard it as entitled to any such effect, and declared, 113 S.W.2d at page 1087: "What was said in that case must, of course, be regarded in the light of its facts". The trial judge in this case (Judge Davis) similarly did not regard the dictum as entitled to control the question here. As in the Cleaver and Brock cases, supra, it seems to us that the question here whether the insured's death was one from poison must soundly, under Missouri law, be regarded as one of fact and not of law. A jury certainly is sufficiently qualified to say whether the average man would regard the death as one from poison by the standard of popular concept.

■ The next question is whether the trial court applied the meaning of the term "poison", as we have discussed it above, in arriving at its decision. A reading of the findings and conclusions seems to us to indicate that the court did not, but that it undertook to decide whether barbital or veronal was a poison on the basis of scientific or toxicological standards. The findings recite that the experts on both sides had agreed that "a poison is a substance which when taken would cause death"—though it can hardly fairly be said that the beneficiary's expert, when his other testimony is considered, assented to this except as a loosely-stated scientific or toxicological definition. The court, however, appears to have accepted and ap-

plied it as the controlling standard, for the findings declare that "this substance (veronal) taken in quantity and under the circumstances and with the result shown in evidence was a poison." We are of the opinion that, in applying only a scientific or toxicological standard, and in failing to determine whether barbital or veronal was a poison by popular-concept definition, the trial court erred.

■ The final question is whether, in spite of this error, the judgment nevertheless must be affirmed, in view of the trial court's further finding that the death in any event was not one from accidental means. Missouri holds that "the word 'means' * * * is equivalent to cause"; that "where the means which causes the injury was voluntarily employed in the usual and expected way, the resulting injury is not produced by accidental means, even though such resulting injury is entirely unusual, unexpected, and unforeseen"; and that "where an unusual or unexpected result occurs by reason of the doing by insured of an intentional act, where no mischance, slip, or mishap occurs in doing the act itself, the ensuing injury or death is not caused through accidental means". Caldwell v. Travelers' Ins. Co., 305 Mo. 619, 267 S.W. 907, 921, 908, 39 A.L.R. 56. See too Pope v. Business Men's Assur. Co., 235 Mo.App. 263, 131 S.W.2d 887, and also United States Mutual Accident Ass'n v. Barry, 131 U.S. 100, 9 S.Ct. 755, 33 L.Ed. 60, cited with approval by the Missouri courts. In Missouri, therefore, death which is merely the unexpected result of a wholly intentional act is not a death from accidental means. To constitute the means accidental in such a case, some causative mischance, slip or mishap must have occurred in connection with the intentional act.[4]

■ The beneficiary argues that death from an overdose of barbital or

[4] The attempt in the Caldwell case, 305 Mo. 619, 267 S.W. 907, 39 A.L.R. 56, to explain numerous other decisions on the basis of the distinction between accidental means and accidental result, serves to remind of Mr. Justice Cardozo's observation, in his dissenting opinion in Landress v. Phœnix Ins. Co., 291 U.S. 491, 499, 54 S.Ct. 461, 463, 78 L.Ed. 934, 90 A.L.R. 1382, that "The attempted distinction between accidental results and accidental means will plunge this branch of the law into a Serbonian Bog." The courts have on occasion had to draw some me-

chanical distinctions in order to permit a recovery in an individual case and still purport to preserve the elusory metes and bounds. In O'Connor v. Columbian Nat. Life Ins. Co., 208 Mo.App. 46, 232 S.W. 218, it was held that death from eating tainted or decomposed food was a death through accidental means. 29 Am.Jur., Insurance, § 991 states that "All the cases where death directly resulted from ptomaine poisoning or poisoning due to eating bad food agree upon the proposition that such death **is** effected by accidental means."

veronal taken to relieve physical pain should be held to be death from accidental means as a matter of law. But the Caldwell case does not permit of any such absolute holding, and on the facts of the present case the argument is only begging the question. Under the Caldwell case, if the insured here intended to take the number of veronal tablets that he did, even though he did not anticipate that death would result, his death would not be one from accidental means. If the circumstances can be said to be such as reasonably to permit of an inference that by some mischance, slip or mishap he took a greater quantity than he intended or realized, then his death might properly be found to be one from accidental means. But, whether the insured took the number of veronal tablets that he intended, or whether some mischance, slip or mishap occurred so that he was not aware of the quantity he was taking, the question was at most one of inference and fact for the trial court. On the evidence, we can not say that the court's finding that the death here did not result from accidental means is clearly erroneous, and it must accordingly be permitted to stand.

Hence, while the court appears to have erred in the definition of poison which it applied, its finding that the death was not one from accidental means is controlling, whether the veronal did or did not constitute a poison. The judgment must accordingly be affirmed.

MOORE, District Judge (concurring in part, dissenting in part).

I concur for the reason that the evidence clearly supports the finding that there was no "accidental means" in this case within the definition laid down by the Supreme Court of Missouri in Cleaver v. Central States Life Ins. Co., 346 Mo. 548, 142 S.W.2d 474, 129 A.L.R. 1094. Deceased took a handful of veronal tablets, with the evident intention of doing exactly that and with full knowledge of what he was doing. Regardless of the foreseen or unforeseen consequences of that act, the act itself does not fit the definition of "accidental means" applied by the Missouri courts, and for that reason plaintiff's case falls.

However, I do not subscribe to the dictum of the majority opinion with respect to the question of "poison". The difference of opinion results solely, I believe, from divergent views on the meaning of Dezell v.

Fidelity & Casualty Co., 176 Mo. 253, 75 S. W. 1102. In that case, an insured had taken morphine by advice of his physician. Inadvertently, the insured imbibed a dose of morphine sufficient to cause his death. Suit was brought on a life insurance policy which specifically excepted from "accidental death", death caused by poison. The final ruling on the case was that, as a matter of law, the morphine was not a poison within the meaning of the policy. The Court said, 75 S.W. loc. cit. 1106:

"The better reason supports the rule that such exceptions in such policies do not cover medicine (even though it contain poison) or anything taken or administered in good faith to alleviate physical pain, even though it results in unexpected and unintentional death."

The facts of the Dezell case and the language of the opinion devoted to the poison question lead me to the conclusion that the sentence quoted is the rule of the case, but not necessarily in its literal context. I think Judge Marshall, in writing the Dezell opinion, recognized that there is a group of substances, among which is morphine, which are difficult to characterize as "poisonous" or "medicinal" because, in truth, they are of a dual nature and are both poisonous and medicinal, depending on the amount used and other circumstances. I think it was the purpose and intent of the Dezell opinion to provide a simple rule for avoiding uncertainty as to the classification of such substances by ruling as a matter of law that no such poisonous-medicinal substance is a "poison" within the meaning of that term, as commonly used in exception clauses of life insurance policies. While it is correct that words of insurance contracts should be given their ordinary and common meaning, and it is also correct that the question of whether a certain substance does or does not come within a given category may be a real issue, and generally one of fact, nevertheless the meaning of the word "poison" as it is dealt with here has been limited for once and for all to the exclusion of poisonous-medicinal substances, and the category "poison" as here used has been conclusively delimited to the exclusion of such substances, by the Dezell case.

The majority opinion interprets the Dezell rule as implying a preliminary issue of fact, to-wit: the question of good faith in taking the poisonous medicine. This would result, I believe, in finding a jury

question in the very situation where the Dezell case held there is no jury question. In other words, my view is that the Dezell case's definition of poison depends solely on the nature of the substance, not in any degree on the circumstances which surround its use. Inquiry into the deceased's state of mind is certainly germane to the issue of "accidental means" and on the issue of suicide, if those issues are raised. The issue as to deceased's state of mind need not be and should not be injected into the definition of the word "poison" as used in the policy. I am satisfied that where you have a substance capable of being either poisonous or medicinal, the law of Missouri is that the court should declare such substance to be not within the meaning of "poison" as commonly used in exclusion clauses of life insurance policies.

I agree with my learned brother that the rule of the Dezell case does not apply to every substance which may be taken in good faith to alleviate pain: according to my view, the rule is inapplicable where the substance is in fact poisonous and cannot under any circumstances be considered medicinal. Thus, in Dixon v. Travelers Protective Ass'n, 234 Mo.App. 127, 113 S.W.2d 1086, the deceased thought he had taken a dose of sodium bromide when, in fact, he took carbolic acid. Now it is conceded that he acted in good faith, but carbolic acid is clearly a poison and is not ordinarily taken internally for medicinal purposes and therefore does not fit the rule of the Dezell case.

The cases fall readily into two categories. The rule of the Dezell case is limited to cases in which the substance taken is of a dual nature. The rule does not apply to the somewhat similar class of cases: those in which deceased mistook a poison for some other substance. The Dixon case, cited supra, and Brock v. American Cent. Life Ins. Co., Mo.App., 44 S.W.2d 200, are examples of the latter type of case, readily distinguishable from the Dezell type of case. The case before us belongs to the Dezell rather than to the Dixon category. The deceased met his end as a result of taking an unusually large quantity of veronal. On the question of whether or not veronal is a poison, I think the Dezell case is controlling here. Veronal is a substance commonly used for medicinal purposes, but having poisonous effect in certain dosage and under certain circumstances. Therefore, I am of the opinion that it was error for the trial court to consider an issue as to whether or not veronal is a poison since it is just such a substance as fits the Dezell rule. However, such error would be harmless since the finding of no accidental means is determinative of the case.