[Civ. No. 11171. Fourth Dist., Div. One. May 18, 1972.]

CAROL A. PILCHER, Plaintiff and Appellant, v.
NEW YORK LIFE INSURANCE COMPANY,
Defendant and Respondent.

**COUNSEL**

Miller, Evatt & Jennings and Patrick D. Campbell for Plaintiff and Appellant.

Gray, Cary, Ames & Frye, David E. Monahan and Dirk T. Metzger for Defendant and Respondent.

**OPINION**

**COLOGNE, J.**—On July 12, 1968, the defendant issued a policy of life insurance to Phillip R. Pilcher, plaintiff's husband, insuring his life in the amount of $10,000. The policy included a provision for the payment of an additional $10,000 if "the insured's death resulted directly, and independently of all other causes, from accidental bodily injury. . . ." The plaintiff and the children born of the marriage were the beneficiaries of the policy.

On April 9, 1970, while the policy was in effect, the insured died as a result of a self-administered overdose of heroin which caused acute heroin intoxication. His body was found at about 6:45 p.m. in the toilet stall of a service station rest room.

A postmortem examination report indicated there were many fresh venipunctures, and old ones too, of both antecubital spaces, wrists and hands. The visual examination of the vital organs, heart, gastro-intestinal tract, liver, spleen, genito-urinary tract, adrenals and pancreas, were all normal.

The death certificate described the cause of death as acute heroin intoxication with the explanation, "Decedent attempting narcotic assistance thru body veins, accidentally over-dosed, expired from accidental reasons."

Plaintiff properly notified the defendant of the insured's death and the defendant paid the face amount of the policy but refused to pay accidental

death benefits. Plaintiff filed the present action to recover the additional benefits. The trial court, sitting without a jury, found that the plaintiff had failed to sustain her burden of proof there was "no accident within the meaning of the policy" and that "under the present state of our social conditions it would be against public policy to enforce such a policy." Judgment was entered for the defendant and plaintiff appeals.

 The plaintiff argues that the court below erred in excluding from evidence that portion of the death certificate which states: "Decedent attempting narcotic assistance thru body veins, accidentally over-dosed, expired from accidental reasons." Section 10577 of the Health and Safety Code provides that a death certificate properly certified by the local registrar is prima facie evidence, in all courts and places, of the facts stated therein. This is an exception to the hearsay rule and is specifically authorized by section 1281 of the Evidence Code. (*People* v. *Holder,* 230 Cal.App.2d 50 [40 Cal.Rptr. 655].)

At the time the plaintiff offered the death certificate as an exhibit objection was made by counsel for the defendant that the document contained legal conclusions and that portion should be excluded. The death certificate was received into evidence with the understanding that the word "accident" as contained in the death certificate was used in the context that it implied the overdose was "not intended" by the decedent and would not be deemed a statement that an "accident" actually occurred as required to establish rights under the policy. In addition, the court stated the certificate would be received subject to the provisions of section 10577 of the Health and Safety Code.[1]

---

[1]The following excerpt from the reporter's transcript [pp. 6-7] reveals the only language available to us regarding the stipulation of the court and counsel on the introduction of the death certificate as an exhibit:

"MR. MONAHAN [Attorney for defendant]: The applicable Health and Safety Code Section which I have now found in Health and Safety Code Section 10577, and it's prima facie evidence of the facts stated therein, and there's several footnotes for the proposition that it's not evidence of the conclusions or the opinions stated therein.

"And I simply want to point that out to the Court.

"THE COURT: Well, Mr. Campbell, did you have any comment on that point?

"MR. CAMPBELL [Attorney for plaintiff]: Nothing. I don't want to dispute counsel's—

"THE COURT: Well, actually, in this particular connection, the word 'accident' here that we're concerned with is a matter of legal conclusion.

"MR. CAMPBELL: That is correct, your Honor.

"THE COURT: And the word there is used in an entirely different context, namely, in the sense, I take it, that it wasn't something intended to happen.

"MR. CAMPBELL: That's correct, your Honor. We're concerned here merely with whether it's an accidental death.

"THE COURT: Within the meaning of the policy.

"MR. CAMPBELL: And whether it was excluded within the meaning of the policy.

While the record is not clear that the parties actually stipulated to this understanding, counsel for the plaintiff and defendant did not object to the introduction of these exhibits after this understanding was expressed, and we must consider any objections at this time ill-founded. (*Thomassett* v. *Thomassett*, 122 Cal.App.2d 116 [264 P.2d 626]—overruled on other grounds in *See* v. *See*, 64 Cal.2d 778, 786 [51 Cal.Rptr. 888, 415 P.2d 776].) In any event, however, the death certificate is, subject to the provisions of section 10577, properly admissible to provide prima facie evidence of the facts set forth.

In our analysis of the issues of this case we are compelled to bear in mind an elementary concept generally applicable to the interpretation of rights under an insurance contract. ██ An insurance policy is a form of contract and while it must be construed the same way as any other contract, giving reasonable and fair attention to the object and intention of the parties, it shall be liberally construed in favor of the insured. (*Southwestern Funding Corp.* v. *Motors Ins. Corp.*, 59 Cal.2d 91 [28 Cal.Rptr. 161, 378 P.2d 361].) The policy is drawn by the insurer and it must use such language as to make the contract clear to the ordinary mind and the language will be deemed to be used in the most inclusive sense. (*Ensign* v. *Pacific Mut. Life Ins. Co.*, 47 Cal.2d 884 [306 P.2d 488].) ██ In addition, we shall bear in mind that the words "accident" and "accidental" have never acquired any technical meaning in the law and must be construed according to ordinary understanding and common usage. (*Richards* v. *Travelers Ins. Co.*, 89 Cal. 170 [26 P. 762].) Webster's Second Unabridged Dictionary defines it as follows: "An event which takes place without one's foresight or expectation; an undesigned, sudden and unexpected event . . . ."

It is variously defined in law but with the same general language. In *Zuckerman* v. *Underwriters at Lloyd's*, 42 Cal.2d 460, 473 [267 P.2d 777], accident is defined as " 'a casualty—something out of the usual course of events and which happens suddenly and unexpectedly and without any design of the person injured.' "

The policy, subject of this action, contains the following provision: "Subject to the terms and conditions of the policy and these Accidental Death Benefit provisions, the Company will pay the Accidental Death Benefit, as a part of the policy's death benefit proceeds, upon receipt of due proof that the Insured's death resulted directly, and independently of all other causes, from accidental bodily injury . . . ."

---

"THE COURT: Very well. Plaintiff's 2 is received on the understanding and subject to the limitations of Health and Safety Code Section 10577."

This language is somewhat different than the standard language found in most of the double indemnity contracts.[2] Moreover, it is different from language found in the other New York Life Insurance policies reported. (See *New York Life Ins. Co.* v. *Griesedieck,* 116 F.2d 559; *New York Life Ins. Co.* v. *Hatcher,* 115 F.2d 52.) The most common language promises payment upon due proof that the insured's death resulted directly from bodily injury caused *solely by external, violent and accidental means*[3] and independently of all other causes. All the reported cases cited by the defendant insurer dealt with policies containing that more restrictive language requiring an injury from accidental *means* which is not found in the policy before us.

We will not speculate why the insurer chose to omit the standard language which narrows its liability because the language before us very generously enables us to avoid that "Serbonian Bog"[4] referred to by Justice Cardozo when he stated in the now famous dissenting opinion, that "The attempted distinction between accidental results and accidental means will plunge this branch of the law into a Serbonian Bog." (*Landress* v. *Phoenix Ins. Co.,* 291 U.S. 491 [78 L.Ed. 934, 54 S.Ct. 461, 90 A.L.R. 1382].) This is a landmark decision involving the language in a double indemnity policy with a provision covering "death from bodily injury effected through external, violent, and accidental means" applied to a person who died of sunstroke. The majority opinion found those restrictive words required a finding that the *means* causing the death, as opposed to the *results,* was unforeseen, unexpected or extraordinary, hence an "accident," under the terms of the policy. The California courts have been most careful to follow this distinction. (*Rock* v. *Travelers' Insurance Co.,* 172 Cal. 462 [156 P. 1029]—

---

[2]Krueger and Waggoner, The Life Insurance Policy Contract, (Published under the auspices of The American Society of Chartered Life Underwriters) reports:

"The following analysis covers the additional indemnity agreement forms used by twenty-two representative life insurance companies doing business in the United States. There is less variation in the terminology and coverage attempted under the positive part of the accidental death coverage than in the risks excepted. All these companies use the phrase death resulting from 'external, violent and accidental means.' One company added 'purely accidental means.' Sixteen companies require a visible wound or contusion. These sixteen companies do cover drowning or internal injuries revealed by an autopsy where an external wound or contusion is not present. Three of these companies modify drowning by the word 'accidental.' One company adds 'and consisting solely and exclusively of a contusion, a rupture or a fracture of an internal organ or part of the insured's body.' All companies require that death occur within ninety days from the happening of the accident which caused the insured's death. Seventeen companies reserve the right to make an autopsy, while the other five companies make no provision for this."

[3]Some policies use these words in the disjunctive.

[4]Milton's Paradise Lost, book 2, line 592.

involving over-exertion; *Zuckerman* v. *Underwriters at Lloyd's, supra,* 42 Cal.2d 460, 473—exposure to the elements.)

We note in passing that some jurisdictions have followed the suggestion of Justice Cardozo in his dissenting opinion in *Landress, supra,* and repudiated that distinction between accidental means and accidental death or results and, in spite of the restrictive language, have held the insurer liable where either the means or the result is accidental. (*Mansbacher* v. *Prudential Ins. Co. of America,* 273 N.Y. 140 [7 N.E.2d 18, 111 A.L.R. 618] —unintentional overdose of veronal; *Morgan* v. *Indemnity Ins. Co. of North America,* 302 N.Y. 435 [99 N.E.2d 228]—amytal (barbiturate) poisoning.) Even when applying the means test, however, the courts nevertheless have held consistently that where the voluntary action consisted of an unintentional overdose of drugs, the resulting death occurred by an accidental means. (*Dezell* v. *Fidelity & Casualty Co.,* 176 Mo. 253 [75 S.W. 1102]— morphine; *Hawkins* v. *New York Life Ins. Co. of New York, N.Y.,* 176 Kan. 24 [269 P.2d 389]—barbiturates; *Feldmann* v. *Connecticut Mut. Life Ins. Co., etc.,* 142 F.2d 628—nembutal; *Mansbacher* v. *Prudential Ins. Co. of America, supra,* 273 N.Y. 140—veronal.) The cases on this subject are collected in 52 A.L.R.2d 1083.

In two of the leading cases which were required by the law of their state to follow the "means" test and found no liability, the courts said there was no accident because a normal or usual dosage of the drug was taken, and the dicta indicates it would rule otherwise if there were an unusual or over-dosage of the drug. (*Glaeser* v. *Prudential Ins. Co. of America,* 57 F.Supp. 198, 200 [applying California law]; *Aubuchon* v. *Metropolitan Life Ins. Co.,* 142 F.2d 20, 26.) In the *Aubuchon* case the court said: "If the circumstances can be said to be such as reasonably to permit of an inference that by some mischance, slip or mishap he took a greater quantity than he intended or realized, then his death might properly be found to be one from accidental means."

It is apparent that if there is a case of an unintended overdose of a drug, even using the "means" test, this court undoubtedly would be compelled to find there was an accidental death. █ The fact is, however, that this more difficult determination has been obviated by the terms of the policy we have before us. If we do as the ordinary person might do, and as the courts generally have done, substitute the words "unintentional and unexpected" for the word "accident," we need only determine that the death resulted directly and independently of all other causes from an unintentional and unexpected injury. The nature of the means causing the injury is not at issue.

There are no California cases with a similar fact situation and construing the language we have before us. *Zuckerman* v. *Underwriters at Lloyd's, supra,* had a policy similar to the one before us but the evidence was not clear just what caused the death. The jury found in favor of the defendant carrier and the appellate court sustained their finding, holding the plaintiff did not show by a preponderance of the evidence that the death was occasioned by an accidental injury. The court found the plaintiff did not negate disease or self-inflicted injury as a cause of death. There are California cases interpreting policies which contain language requiring a showing of "accidental means" and while these would not be applicable here, they do strengthen the conclusion that the case before us is clearly an accidental injury. In *Horton* v. *Travelers Ins. Co.,* 45 Cal.App. 462 [187 P. 1070], for example, the court had a "means" language policy and said the unintentional drinking of a glass of poison, thinking it to be water, was an accidental means though voluntarily taken by the deceased. See also *Glaeser* v. *Prudential Ins. Co., supra,* involving a "normal" dose of chloroform, where the court held there was no injury by accidental means but, as indicated above, concluded if it had been an overdose, a different result would be had. In *Rock* v. *Travelers' Insurance Co., supra,* 172 Cal. 462, there was a policy which used the language that death resulted from bodily injuries effected through "external, violent and accidental means." It said (p. 465): "The policy, it will be observed, does not insure against accidental death or injuries, but against injuries effected by accidental means." Its language clearly indicates a different result would be had if the policy insured against accidental injuries, which the policy before us does.

We have a limited amount of evidence available to us. The death certificate is prima facie evidence of the facts contained in it. (Health & Saf. Code, § 10577.) The certificate verifies for us certain facts, namely, Pilcher died of acute heroin intoxication as a result of a self-administered overdose of heroin. The postmortem report which went into evidence without objection, indicates no abnormal condition of the vital organs, ruling out their deterioration from long or repeated use of drugs as a possible factor in the death.

The trial court said in reading the death certificate it would substitute "not intended" for "accidental" as it referred to the overdose. Intention is a state of mind, however, and would normally be considered a conclusion. It is not a "fact" within the meaning of section 10577 which can be reported by a medical officer, but there is other uncontradicted evidence of the unintentional nature of the acts which cannot be ignored and which binds the court to reach the same conclusion.

When the death certificate was offered into evidence the discussion by counsel and the court clearly indicates to us that it was an agreed-upon conclusion by all concerned, i.e., that this was an unintended overdose. In oral argument before this court, Mr. Monahan, counsel for insurer, stated again the taking of the life was not intended. In addition, we note (1) the decedent was found in a service station rest room, a location the ordinary man would choose obviously for convenient, temporary use rather than a place to be found dead; (2) the decedent had numerous needle marks on his arms and, by stipulation, was a drug addict, indicating repeated use of some kind of drug over a period of time, and that this dosage was simply intended to be another in a series; and (3) the stipulation of counsel for the defendant that this was not a suicide because, as he put it, if it were, the insurance company would not have paid the initial ordinary benefits of the policy. If this is not an intentional taking of one's life, it must have been unintentional.

All of this uncontradicted evidence without anything being offered by the defendant leads one inescapably to the conclusion that the decedent was just getting another "fix" to satisfy his addiction to the drug, and that the overdose was unexpected, undesigned and certainly unintentional. Very obviously he intended the act of administering the drug but he did not intend the overdose or the resultant death.

There were no other contributing causes of death suggested by the evidence or by counsel, so we must conclude his death came as a result, directly and independently of all other causes, from accidental bodily injury occasioned by acute heroin intoxication when the overdose of heroin was unintenionally self-administered.

We find no authority to suggest we should refuse to enforce an insurance contract on the theory that the use of narcotics should be deterred and that allowing recovery is against public policy.

We have read the case cited by the respondent (*Republic National Life Insurance Co.* v. *Hamilton* (Tex.Civ.App.) 373 S.W.2d 275), which involved a double indemnity provision of a life insurance policy similar to this and a death resulting from the use of heroin. In that case, however, there was an additional factor, the deceased remained in a closed car having a 148° temperature and limited oxygen. The testimony did not establish an overdose of drugs was used; also it was made clear by expert medical testimony that the heroin alone was not sufficient to cause death. The Texas court, while it expounded at length on the evils of heroin by way of dicta and indicated that the death from heroin "would not be the

result of accidental *means*" (italics added), found the clear intentional acts of the decedent amounted to suicide. The court said (p. 280): "The taking of the heroin and sitting in the closed car were calculated to produce death." We do not see that here.

The other language quoted by respondents on this issue of public policy came from a case (*Gordon* v. *Metropolitan Life Insurance Company,* 256 Md. 320 [260 A.2d 338]), which involved an insurance contract with "means" language and where the dosage was apparently not lethal but when used in combination with another drug, Doriden, also not lethal but with higher than normal quantities, caused the death. Citing *Landress, supra,* the court found the death was not by accidental *means* but an accidental *result.* The court said [at page 340]: "When a man injects himself with a dangerous drug and *no mishap occurs in the injection,* though an unexpected result occurs, there is no reason to obliterate the distinction between means and results. . . ." (Italics added.) We take that to mean if there was a "mishap," a different conclusion would follow. We agree and believe that that court would reach the same decision we adopt had there been an unintentional overdose, as we find here.

We find no authority that the illegal possession of drugs is sufficient to destroy the contractual rights provided in the insurance policy.

We are mindful of the fact that the United States Supreme Court has said heroin addiction is a disease (*Robinson* v. *California,* 370 U.S. 660 [8 L.Ed.2d 758, 82 S.Ct. 1417]) but unless it is the proximate cause of death, it would not be a factor to bring this within the policy exclusion. (*Brooks* v. *Metropolitan Life Ins. Co.,* 27 Cal.2d 305 [163 P.2d 689]; *Zuckerman* v. *Underwriters at Lloyd's, supra,* 42 Cal.2d 460.) That is not shown to be true here. Additionally, it is an affirmative defense which must be raised in the pleadings and proved by the defendant carrier, which was not done. (*Mattson* v. *Maryland Casualty Co.,* 100 Cal.App. 96, 98 [279 P. 1045].)

This court does not wish to countenance the use of heroin or any dangerous drug, but we find it is not unworthy for an insurance carrier to offer to protect the family from the loss which occurs from such a death. If the defendant believes it will help deter the use of drugs by eliminating such benefits, it should except death from this cause from its coverage, which some companies do.[5]

---

[5]Krueger and Waggoner, The Life Insurance Policy Contract, page 278, section 15.2, states:
"Drugs:
"Six companies exclude death from drugs. One company adds 'sensitivity to or

Judgment reversed with directions that judgment should be entered for the plaintiff in the amount of $10,000 together with costs.

Brown (Gerald), P. J., and Ault, J., concurred.

A petition for a rehearing was denied June 2, 1972.

---

overdose of.' Another adds 'or medicine.' One company goes into detail on this subject and excludes death resulting from the 'administration to the insured or injection into the body of the insured of any drug or anesthetic, local or general, or the administration or taking of any opiate, narcotic, or hypnotic drug, accidentally or otherwise."